270 F.Supp.2d 1068 (2003)
In re in the Matter of the Complaints of the AMERICAN MILLING COMPANY, Unlimited, H & H Marine, Inc., and American Milling, L.P. a limited partnership, and Winterville Marine Services, Inc., for exoneration from or limitation of liability, Petitioners.
No. 4:98CV575SNL.
United States District Court, E.D. Missouri, Eastern Division.
June 12, 2003.
*1072 Ralph Levy, III, Oelbaum and Brown, Kirkwood, MO, for Karen G. Cruse.
Bertram Cooper, Kurt C. Hoener, Bertram and Cooper, P.C., St. Louis, MO, for Larry Dees.
Keith G. Liberman, Liberman Law Firm, LLC, Clayton, MO, Stan J. Goodkin, Goodkin Law Office, St. Louis, MO, for Sonya Owten.
John R. Halpern, Gary T. Sacks, Daryl F. Sohn, Goldstein and Price, L.C., St, Louis, MO, for American Milling Company.
William B. England, St. Louis, MO, for Lue Willie Harvey and James Lewis Brown.
William R. Bay, Raymond L. Massey, Michael D. O'Keefe, Sr., John S. Farmer, Suzanne L. Montgomery, Thompson Coburn, St. Louis, MO, for President Riverboat Casinos, Inc.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This is an admiralty action involving the allision of the M/V ANNE HOLLY with the Eads Bridge, and the secondary allision by one or more barges in the M/V ANNE HOLLY's tow with the ADMRAL, on April 4, 1998. Pending before the Court are three lawsuits, two of which are consolidated Complaints for Exoneration and/or Limitation of Liability filed pursuant to 46 U.S.C. ง 181 et seq. by American Milling Co. and Winterville[1] and a negligence action brought by President Casino and certain barge owners against defendant John 0. Johnson filed pursuant to 28 U.S.C. ง 1331(1).[2] In the exoneration/limitation cases, the claimants include President Casino, certain barge owners, the City of St. Louis, and numerous individuals alleged to have been aboard the ADMIRAL and suffered personal injuries when it was struck by one or more of the runaway barges. Counterclaims and crossclaims for indemnity and/or contribution have been filed by American Milling and Winterville against the President Casino for failure to take reasonable steps to protect the ADMIRAL from runaway barge(s) allisions.
At all material times, American Milling Co., UN Ltd., H & B Marine, Inc. and American Milling, LP (hereinafter referred collectively as American Milling) was the owner and operator of the M/V ANNE HOLLY, an inland river towboat. American Milling's base of operations is located in Alton, Illinois.
At all material times, Winterville Marine Services (hereinafter referred to as Winterville) was a marine service company providing crewing services for American Milling and other towboat owners and operators. At the time of the subject allision(s), Winterville was providing the crew for the M/V ANNE HOLLY. Winterville is based out of Greenville, Mississippi.
At all material times, President Riverboat Casino-Missouri, Inc, (hereinafter referred to as President Casino) was the owner and operator of the ADMIRAL, a moored vessel upon which is situated a *1073 gambling casino. At the time of the subject allision(s), the ADMIRAL was moored to the Missouri bank of the Upper Mississippi River (UMR) immediately below the Eads Bridge, within the City of St. Louis, Missouri.
At all material times, defendant John 0. Johnson was a licensed riverboat pilot and captain employed by Winterville and working as the river towboat captain aboard the M/V ANNE HOLLY.
At all material times, claimants Pinnacle Barge Co. LLP and/or Pinnacle Transportation, Brennan Marine, Riverland Resources, and Robert B. Miller & Associates (hereinafter referred to collectively as the "barge claimants") were owners of barges in the tow of the M/V ANNE HOLLY at the time of the April 4, 1998 allision(s). Specifically, Pinnacle Barge owned and/or operated Barges PIN 348B and PMC 8101B; Brennan Marine owned and/or operated Barges MWO 211 and ABC 767; Riverland Resources operated Barge SB 15B; and Robert B. Miller & Associates owned and/or operated Barges RM41, CGB 219, and ITEL 206.[3]
At all material times, City of St. Louis was a political subdivision of the State of Missouri and owned that part of the levee where the ADMIRAL was moored on April 4,1998.[4]
At all material times, the approximately 150 personal injury claimants not specifically named herein were alleged patrons of the ADMIRAL at the time of the accident. Since the Court bifurcated the proceedings in this admiralty action, conducting a separate trial on the issues of liability and limitation, the personal injury claimants' claims were not addressed at this time. Their individual claims will be addressed in a future proceeding.
Trial of this case was bifurcated. Due to the complex nature of this litigation, the Court elected to separate the issues of liability and limitation concerning the primary allision with the Eads Bridge and the secondary allision with the ADMIRAL, from issues of liability concerning the personal injury claimants' claims. Thus, a separate trial on the issues of liability and limitation commenced on June 13, 2000 and concluded after recesses, on September 28, 2000.[5] An extended post-trial briefing period followed and the matter is now ripe for disposition.[6]
As stated previously, this opinion will only address the issues of liability and limitation of liability. The issues of damages and (if deemed applicable) prejudgment interest will be addressed separately at a later date. In order to present properly the Court's final determinations, background data in accordance with this Court's factual findings regarding the MV ANNE HOLLY, the M/V ANNE HOLY's crew, American Milling and Winterville's marine operations and working relationship, the ADMIRAL, the St. Louis *1074 Harbor, and the Eads Bridge is provided along with the Court's findings of fact pertaining to the M/V ANNE HOLLY's voyage on April 3-4, 1998 through the St. Louis Harbor and allisions with the Eads Bridge and the ADMIRAL Finally, the Court's factual findings are provided regarding certain post-April 4, 1998 events concerning the subject allisions.
After due consideration of the testimony and exhibits introduced at trial, and the parties' stipulations and briefs, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 Fed.R.Civ.P. All objections to trial evidence taken with the case are overruled with the exception of the objections made to certain National Transportation and Safety Board (NTSB) exhibits and Coast Guard exhibits, as well as certain exhibits pertaining to the "no contest" plea entered by Capt. Johnson in connection with a Coast Guard disciplinary action. The subject NTSB and Coast Guard administrative exhibits (not including the "no contest" plea exhibits) were all offered by President Casino and are as follows: A-4, B-t, B-10, C-3, C-10, E-9, F-9, G-4, G-9, J-9, and L-9.
The NTSB is granted authority to investigate certain marine casualties pursuant to 49 U.S.C. ง 1131(a)(1)(E). The investigative authority granted to the NTSB is limited to "factfinding proceedings" with broad powers granted to the Chairman of the Board of Inquiry to designate parties to the investigation, and to conduct interviews of witnesses. No party or witness to a NTSB investigation can be represented by an attorney or by any person who also represents claimants or insurers. 49 C.F.R. ง 845.1 et. seq. With regard to NTSB reports, 49 U.S.C. ง 1154(b) provides: "No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."
The NTSB exhibits offered into evidence consist of interviews with various witnesses in connection with the events of April 4, 1998, as well as the NTSB hearing transcript. The Court finds these exhibits inadmissible under Rule 801 F.R.E. These documents contain statements by persons not represented by counsel and questioned by persons other than judicial or legal officers of a court. These statements are offered solely for the truth of the matter asserted; i.e. the legal liability (negligence) of parties involved in this litigation. As to documents offered pursuant to Rule 801(d)(1) against Capt. Johnson, the Court finds that such documents are not admissible for impeachment purposes as Capt Johnson's trial testimony was consistent with all prior testimony at these administrative hearings. Nor does this Court consider these documents admissible under Rule 804 F.R.E. American Milling was not designated a party in interest to the NTSB hearing, and therefore, did not have the right to participate and develop the testimony offered through direct, cross, or redirect examination.
Subsequent to the subject allision(s), the Coast Guard also conducted an investigation pursuant to 46 U.S.C. ง 6301. Offered into evidence by President Casino is Exhibit C-10, a transcript of the Coast Guard investigatory hearing conducted on April 8, 1998. The admissibility of a documents produced in the course of a Coast Guard casualty investigation is governed by 46 U.S.C. ง 6308, which states:
"Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under ง 6301 of this title, including findings of fact, opinions, recommendations, deliberations or conclusions, shall be admissible as evidence or subject to discovery in *1075 any civil or administrative proceeding other than administrative proceedings initiated by the United States ...".
The purpose of ง 6308 is made clear by the regulations governing Coast Guard ง 6301 investigations:
"An investigation of marine casualties and accidents and the determinations made are for the purpose of taking appropriate measures promoting safety of life and property at sea and are not intended to fix civil or criminal responsibility."
46 C.F.R. ง 4.07-1(b).
The Court finds that Exhibit C-10 is inadmissible and will be excluded from consideration by this Court.[7]
Finally, the Court needs to consider President Casino's Exhibits S-2, T-2, U-2, V-2 and W-2. These exhibits all concern the Coast Guard's charge of negligence against Capt. Johnson, and his subsequent plea of "no contest" to the charge at a license suspension or revocation hearing. These exhibits have been admitted over objections to them. Pursuant to Rule 410 F.R.E., evidence of a plea of nolo contendere is not, in any civil or criminal proceeding, admissible against the defendant who made the plea. Thus, these exhibits are admissible only to establish that the Coast Guard initiated an action against Capt. Johnson to suspend his pilot's license following the allision(s) of April 4, 1998, and that Capt. Johnson entered a plea of "no contest" in connection with the Coast Guard's action to suspend his pilot's license. This was a fact testified to at trial. These exhibits have not influenced in any way the Court's final decision in the matter at hand, nor may these exhibits be used to collaterally estop Capt. Johnson from defending against the claims of negligence levied against him by President Casino and other claimants.

FINDINGS OF FACT

The M/V ANNE HOLLY
The M/V ANNE HOLLY is a dieselpowered inland river towboat of steel construction, measuring approximately 154 ft. in length and 40 ft. in width. It is a twinscrew river towboat built in 1973 by the Mississippi Marine Towboat Co. in Greenville, Mississippi. At the time of the allision with the Eads Bridge, all equipment and systems aboard were operating properly with the exception of the port engine shaft tachometer (a device which enables one to read the port engine's rpms from the pilot house). In lieu of the port engine shaft tachometer, hand tachometer readings were utilized. The marine radios, the main propulsion system, the steering system, and the navigational lights were all functional.
The M/V ANNE HOLLY is an open wheel rather than a kort nozzle towboat. Although kort nozzle towboats normally generate more horsepower, open wheel towboats are preferred on the UMR due to better steering agility. An open wheel towboat's superior maneuverability is an *1076 attribute when navigating the numerous bridges, locks, and dams on the Mississippi River, especially the UMR. The M/V ANNE HOLLY was equipped with flat plate rudders: two steering rudders located aft of the propellers, and four flanking rudders located forward of the propellers which steered the boat when its engines were ahead.
Although the M/V ANNE HOLLY's engines were identified by their manufacturer's identification plates as "EMD 16-645 E7" engines, in reality they were "EMD 16-645 E5" engines. The difference being that E7 engines have an oil strainer and other certain accessories while the E5 engines did not have these additions. Both the E5 and E7 model engines have a rated horsepower (hp) of 2850-2875 when the engine's rpms were at 900 and the "rack" setting is .98. The "rack" is an internal component in each engine which regulates the amount of fuel delivered to each of the engine's 16 cylinders. A stop inside the Woodward governor (a device which regulates each engine's rpms.) determines the maximum amount of fuel delivered to each engine. At the time of the allision with the Eads Bridge, the M/V ANNE HOLY's rack stops were set at .92. This allowed the engines to develop more than their rated hp. at 900 rpms; i.e., at a rack setting of .92 and the engines' rpms at 900, each engine would develop approximately 3030 hp. ("overload").
It was American Milling and Winterville's policy to have the crews regulate the engines, and components, to the manufacturers' specifications. Consequently, the air pressure on the governor was set for 70 lbs. at 900 rpms. Under certain conditions, after consultation with management personnel, or in cases of sudden emergency upon the captain or pilot's request, the engines were permitted to operate in excess of 900 rpms ("overspeed").
The M/V ANNE HOLLY is also equipped with an "overspeed trip". This safety device shuts fuel off to the engines when the engines reach a certain rpm, which in the case of the M/V ANNE HOLY was 990 rpms. Such an event might occur if a propeller were lost and the engine's rpms suddenly began to accelerate. Without the overspeed trip the engine would literally blow apart.
American Milling acquired the M/V ANNE HOLLY in 1989. Prior to April 4, 1998, regular maintenance and repairs had been done on her. The starboard port main engines were overhauled in 1993 and 1997. Manufacturer maintenance schedules recommend an overhaul at 25,000 plus hours; as of April 4, 1998, the port engine had operated 2629 hours since its last overhaul and the starboard engine had operated 19,582 hours. Both reduction gears were rebuilt in 1997. Significant rudder work was performed during drydock in 1997. As previously found by this Court, as of April 4, 1998, the M/V ANNE HOLLY was in reasonable maritime shape and had a remaining useful life of 15 years.

The Crew of the M/V ANNE HOLLY
The crew assigned to the M/V ANNE HOLLY on April 4, 1998 included: Captain John O. Johnson, Captain Robert Hoelscher (acting as pilot), Mate Chris Davis, Chief Engineer Charles Brown, Assistant Engineer/Oiler Jim Brown, three deckhands, and a cook.
Capt. Johnson began his marine river career in 1958 as a 15 year old deckhand. At 17, he was piloting vessels under supervision; by age 20 he was piloting vessels himself. In 1969, he made his first of many trips as a pilot on the UMR through the Eads Bridge. From 1969-1988 he worked for several inland river towboat companies including Port Arthur Towing, Brent Towing, Lawson & Lawson, Luhr *1077 Bros., Dixie Carriers and General Marine Towing. During these years he regularly navigated through the St. Louis Harbor.
He had two stints of employment with Winterville. From 1988-89 he was employed by Winterville and served primarily as a pilot on three vessels: M/V MARGRET D; M/V MELISSA L and the M/V AETNA. All three of these boats operated on the UMR. From 1989-1992 Capt. Johnson did trip work primarily as a pilot on the UMR through the St. Louis Harbor for Marquette Transportation and American River Transportation. He regularly piloted boats pushing unit tows and barge line tows. In 1993, he rejoined Winterville and served as a captain or pilot on several vessels, including the M/V ANNE HOLY, navigating the UMR through the St. Louis Harbor. Although he piloted other towboats from time to time, from 1995 to the date of the subject allision(s), he mostly served aboard the M/V ANNE HOLLY as pilot or captain.
From 1995-98, while serving aboard the M/V ANNE HOLLY, Capt. Johnson successfully transited numerous times the UMR through the St. Louis Harbor, southbound and northbound. He had piloted mixed tows of loaded and empty barges, as many as 15, in varying river stages, including high water (20 ft or more on the St. Louis gauge) and flood water (30 ft. or more on the St. Louis gauge). From 1995-97 alone, he had navigated the St. Louis Harbor at least twelve (12) times.
In almost thirty (30) years of piloting towboats on the Mississippi River, Captain Johnson had only one accident. Prior to the allision(s) of April 4, 1998, he had been involved in only one other allisionโsometime in the late 1980s, while piloting the M/V ROYAL VIKING southbound on the Lower Mississippi River (LMR) at Huntington Point, one of the engines failed causing him to lose power to steer the bend, and he allided with the Texas Eastern Oil Dock at Mile 555. No charge of negligence by the United States Coast Guard or any Coast Guard license suspension or revocation proceeding was ever initiated with regard to the Texas Eastern Oil Dock allision (or any other marine incident) involving Captain Johnson.
Captain Robert Hoelscher, at the time of the subject allision(s), had been piloting the Mississippi River for approximately twenty (20) years. The majority of these years had been spent on the UMR moving 15 barge tows between St. Louis and St. Paul, Minnesota. Consequently, he was familiar with navigating the St. Louis Harbor. Since 1993 he had been employed by Winterville serving aboard the M/V ANNE HOLLY.
Chief Engineer Charles Brown had worked as an engineer aboard towing vessels since 1975, and primarily aboard the M/V ANNE HOLLY since 1993. Prior to serving on the M/V ANNE HOLLY, Chief Engineer Brown had served upon the M/V CHARLES F. DITTMEYER, JR. which had the same engines as the M/V ANNE HOLLY. Furthermore, he had participated in the overhaul of the M/V ANNE HOLLY's starboard main engine in 1992.
The remaining crewmembers, at the time of the subject allision(s), had worked aboard towing vessels for several years. They had been assigned together as crewmembers for several years. They had served together aboard the M/V ANNE HOLLY numerous times.

American Milling and Winterville's Marine Operations and Relationship
American Milling owns and operates towboats on the Mississippi River. David Jump is American Milling's President. Ric Lamb became American Milling's operations manager in 1990 and was employed in that capacity on April 4, 1998. *1078 Lou Draper, with over twenty (20) years marine experience, was American Milling's port engineer as of April 4, 1998. Beginning in the late 1980s and throughout the 1990s, American Milling operated a number of towboats, including the M/V ANNE HOLLY, on the UMR. Usually its towboats were fully-found chartered and engaged in tramp-towing. Up until the end of the 1992 UMR towing season, American Milling had operated 8-9 towboats and employed crews to man them. After the 1992 UMR towing season, American Milling decreased its towboat fleet size to three (3) and decided to retain the services of a professional crewing service to provide the manpower on these towboats.
Based upon the recommendation of one of its long-time charterers, East Side River Transportation, American Milling contacted Winterville about utilizing its crewing service. Winterville had been organized in 1988 by James Nowell to provide marine management services, including the provision of crews for towboats. Prior to organizing Winterville, Nowell had been employed by various towing companies working the UMR. He was involved in all aspects of marine operations for these towing companies, including interviewing and hiring towboat pilots. After contacting several towboat companies which had used Winterville's crewing services, and discussing at length with Nowell Winterville's ability to meet American Milling's crewing needs, American Milling and Winterville entered into a crewing agreement under which Winterville provided crews beginning with the 1993 UMR towing season. At the time of the subject allision(s), a crewing agreement between American Milling and Winterville was in effect.
At the time of the subject allision(s), a fully-found charter existed between American Milling and East Side River Transportation (East Side). Under the charter, American Milling received a daily rate of $4000.00 per day for the M/V ANNE HOLLY. East Side was responsible for all fuel costs. As previously stated, a crew agreement existed between American Milling and Winterville. Under the crewing agreement, American Milling paid Winterville $2050.00 per day for each day the M/V ANNE HOLLY worked the UMR. Winterville employed the crew (after assessing qualifications) and paid the crew's salary, including withholding applicable taxes. It provided the crew with transportation to and from the M/V ANNE HOLY. It further provided the crew with a telephone and side-band radio. American Milling was consulted prior to hiring a pilot for any American Milling boat. Although American Milling left hiring decisions to Winterville, it did retain the right to request that Winterville have a crew change on any particular American Milling vessel, or to have a crew member removed from a boat.
Prior to the start of the UMR towing season, it was the usual practice for American Milling personnel to meet with the Winterville crews. These meeting included Ric Lamb, Lou Draper, the boat's captain, pilot, and chief engineer. Generally, Winterville assigned the same crew to the same boat on a regular basis to encourage a solid working relationship among the crew members and familiarity with the boat. Lamb and Draper provided the crews with information regarding maintenance work and/or repair work during the off-season, navigation conditions existing in the area, any known bulletins issued by the Coast Guard such as notices to mariners regarding locations where helper tugs are recommended or required. They would also review with the crew any changes in operating policy and procedures. During the UMR towing season, Lamb would board a vessel more than once to check on the boat's condition and *1079 the crew. Lamb had regularly boarded the M/V ANNE HOLLY during past UMR towing seasons to confer with the crew and check the boat's condition. Otherwise, Lamb and Nowell were available to a crew twenty-four (24) hours a day, by cell phone, to address any problems or emergencies that might arise during a trip.
American Milling required daily pilothouse and engine room logs be maintained while a boat was in service. The captain or pilot recorded the location and time barges were taken into or removed from the tow, use of any helper tugs, and any accidents or incidents involving the towboat or its tow. The chief engineer was required to record information about the main engines and other machinery aboard the boat in the engine room log. Pilothouse logs were faxed to American Milling, Winterville, and East Side everyday at 4:00 a.m. Engine room logs were faxed to American Milling everyday at 4:00 a.m. as well. American Milling and Winterville management personnel reviewed the logs daily to monitor the towboat's location, miles traveled, fuel and oil consumption, and if any problems with the boat or crew were noted.
It is Winterville's regular policy to leave navigation decisions to its captains and pilots. These include decisions regarding tow size, tow composition, the use of helper tugs, whether it is safe to proceed in light of river conditions, and other decisions affecting the safety of the crew and tow. It is marine custom and practice to leave such decisions up to the captain or pilot since they are considered to be in the best position to make these decisions based upon experience and first-hand knowledge of river conditions.

The ADMIRAL
The ADMIRAL is a licensed floating gambling casino moored to the Missouri bank of the UMR immediately below the Eads Bridge, within the City of St. Louis. It had been located at Mile 179.9 since 1983 pursuant to a permit issued by the Army Corps of Engineers under the River and Harbors Authorization Act of 1899, 33 U.S.C. 403. As a permanently moored gambling casino, it sits in a navigable channel of the Mississippi River, yet no longer retains certain attributes of similar vessels: engines to power motion and steering, life jackets, and marine radio equipment to communicate with the Coast Guard.
In 1983 when the President Casino renovated the ADMIRAL as a gambling enterprise (it had formerly been an entertainment vessel), it sought to modify its 1983 permit (Permit No.P-1550) with regard to its mooring. President Casino's engineering consultant and a stockholder, William Ashton, had only considered whether the ADMIRAL could withstand the normal forces of current, wind, and drift when petitioning for the modification of Permit No.P-1550. The modification sought did not reference any type of protective structure from more significant impacts involving runaway barges or boats.
The Army Corps of Engineers approved, in writing on November 23, 1994, President Casino's permit modification. Colonel Thomas Suermann, United States Army District Engineer, allowed for the requested mooring modification; however, he further stipulated:
"Additionally, I have deemed it necessary that the S.S. ADMIRAL must emplace a protection cell to provide protection from the ice flow, debris and breakaway tows. The cell constructed is to be able to provide protection to the gaming vessel for a breakaway tow with 15 fully-loaded barges traveling at two miles per hour under normal vessel operating conditions. The cell shall be *1080 placed to protect the bow of the starboard side of the gaming vessel. President Casino must submit preliminary plans for the location and design of the protection cell to the regulatory branch no later than thirty (30) days from receipt of this letter."
William Ashton addressed the matter on President Casino's behalf, and despite concerns by himself and other President Casino management personnel regarding runaway barge allisions, he ultimately recommended to the Coast Guard that no cell be built. Based upon Ashton's recommendation, and its belief that President Casino was intending to move the ADMIRAL to a new location in the near future, Captain Scott Cooper of the U.S. Coast Guard, on July 10, 1995, wrote the Corps of Engineers that a protective cell would not significantly improve safety on the S.S. ADMIRAL.
President Casino never submitted any plans for a protective cell as required by modified Permit No. P-1550. The President Casino did not move the ADMIRAL to its present location until 2001-2002. The Army Corps of Engineers never issued a subsequent letter affirmatively removing the protective cell requirement nor did it ever take any action against the President Casino (prior to April 4, 1998) for not constructing a protective cell. However, a subsequent permit (issued prior to April 4, 1998), Permit No. P-2027 authorizing the President Casino to moor an additional support barge and a casino riverboat, stated (among other things):
"All general and special conditions pertinent to previous Department of Army permits the permittee possesses still apply and are hereby incorporated by reference into Permit P-2027."
Prior to April 4, 1998, within the last fifteen (15) years, the ADMIRAL had been struck, during high or flood water, by runaway barges on several occasions. On February 23, 1985, the northbound tow of the M/V CRESCENT CITY struck the Missouri pier of the Eads Bridge. Part of the tow broke loose, drifted southbound, striking the ADMIRAL and causing it damage. On April 23, 1991, the northbound tow of the M/V WENDY ANN struck the Eads Bridge, drifted downstream, and hit the ADMIRAL'S bow. Finally, on May 5, 1994, the M/V ROBERT LOVE's northbound tow hit the Missouri pier of the Eads Bridge, drifted downstream, and hit the ADMIRAL'S bow.[8]

The St. Louis Harbor
The St. Louis Harbor has been described as one of the most difficult and hazardous areas in the Mississippi River to navigate, especially in high or flood waters. The physical layout of the St. Louis Harbor, and its navigational obstacles, were expertly detailed in 1971 by United States District Court Chief Judge William C. Ready in Petition of Canal Barge Co.(M/V ELAINE JONES), 323 F.Supp. 805 (N.D.Miss.1971). The testimony and credible evidence adduced in the present case indicates that these characteristics remain unchanged except that the Veterans Bridge is now called the Martin Luther King (MLK) Bridge. This Court adopts Judge Keady's description as follows:
3. St. Louis Harbor, the site of this accident, because of the presence of six river bridges, their close proximity and construction, coupled with the meander of the river and its currents, enjoys a reputation among river people of being a difficult area or passage to safely navigate, *1081 particularly in high water. A vessel southbound, as was the ELAINE JONES, after departing Lock 27, is first confronted with the Merchants Bridge (Mile 183), and then the McKinley Bridge (Mile 182.5), which present limited horizontal clearance. Immediately after passing the McKinley Bridge, the vessel must line up for safe passage of the Veterans Bridge (Mile 180.2) and then the Eads Bridge (Mile 180). Just down river from the Eads Bridge are the Poplar Street Bridge (Mile 179.3) and the MacArthur Bridge, also known as the "City" bridge (Mile 179). For south-bound traffic, a gradual bend in the river from left to right occurs above the *809 Veterans Bridge and extends to below the MacArthur Bridge. Contributing to the navigation problem is the presence of Eads Bridge which, due to its arched construction, affords a limited amount of clearance in high water through which vessels can safely pass. Also, during high water, i.e. 20 feet or more on the St. Louis gauge, the current immediately above Veterans Bridge runs from the right descending bank to the left descending bank, from the Missouri shore toward the Illinois shore. This high water current condition, called a left-hand "set" or "draft," has a pronounced effect of moving a southbound boat and tow toward the Illinois bank rather than straight ahead. These navigation conditions exist whenever the river is at 20 feet or more on the St. Louis gauge and are facts known to experienced mariners navigating towboats through that section of the Mississippi River.
....
5.... As the river stage exceeds 20 feet, the force of the aforementioned set to the left of above Veterans Bridge likewise increases; and also as the rate of rise in the river accelerates, the force of the set becomes more violent. Although a sudden rise of the river increases the severity of the set, this is an operating factor known to persons experienced in navigating St. Louis Harbor during high water. Moreover, the experienced navigator of a downbound vessel can reasonably predict the severity of current in St. Louis Harbor by observing upriver conditions at Wood River, Illinois, and water levels at Lock 27.
6. The above left set or cross-current is not encountered by downbound vessels except in high water. At all other times the current in the immediate area runs straight down the river. When navigating the harbor downbound in low water (10 feet or less), it is an acceptable practice for a vessel to approach the Veterans and Eads Bridges in line with their green lights and pass under both along the mid-channel sailing line, as depicted on the U.S. Engineers' official chart (Ex. 13). See App. A This sailing line is the normal low water configuration for passage of a descending vessel. When navigating the harbor downbound in high water, it is the commonly accepted practice, in order to compensate for the left hand set encountered just above Veterans Bridge, to approach Veterans Bridge well to the right of the midchannel sailing line, or favoring the Missouri shore. By this means, the vessel and tow are not forced by the crosscurrent to the left of the mid-channel sailing line, as it runs immediately beneath both the Veterans and Eads Bridges. Thus, a downbound vessel and tow that in high water approach the Veterans and Eads Bridges within onequarter of a mile north of Veterans Bridge on the mid-channel sailing line are too wide or `out of shape' to safely navigate the passage beneath the two bridges."
Id. at 808-09.
Although Judge Keady's detailed description of the St. Louis Harbor described *1082 a voyage southbound, the Court finds its description equally applicable to a northbound vessel's voyage; i.e., the direction and effect of the currents or sets through the Eads Bridge on a northbound tow versus a southbound tow is almost totally opposite. The credible evidence at trial shows that as it is the customary practice for pilots navigating southbound through the St. Louis Harbor in high water to have their tows favoring the right descending pier (Missouri) as they set up to run the MLK Bridge and then through the Eads Bridge, it is equally customary for these same experienced pilots navigating northbound under similar circumstances to set up to transit the Eads Bridge by guiding the head of their tow towards the left descending pier (Illinois) of the center span of the Eads Bridge.
A northbound tow must proceed upriver in alignment with the current. If the vessel does not remain relatively straight with the current flow, it will move to port or starboard depending upon which side of the tow is presented to the current. Therefore, it is necessary that as the tow clears the Poplar Street Bridge and approaches the channel span of the Eads Bridge it steer slightly to port in order to turn into the current coming through the span. Ideally, the tow should be as straight with the current as possible and perpendicular to the bridge when the tow starts through it. This is because as the tow proceeds into and through the channel span and becomes perpendicular to it, the current flow is on the starboard side of the tow and drafts the tow from the Illinois side of the bridge toward the center of the bridge as the tow continues upriver. As testified to by Captain Michael Rushing, an inland river towboat pilot and captain of many years experience navigating the UMR, including the St. Louis Harbor (northbound and southbound), the transit of a northbound vessel through the Eads Bridge requires the vessel to cross from the Illinois side of the center of the river from below the bridge, to the Missouri side of the center of the river, when above the bridge, in order for it to navigate safely through and against the flow of current through the channel span.
A significant dispute at trial concerned the accuracy of President Casino's Exhibit Z-11 which purportedly illustrated the St. Louis Harbor and the currents within it. After careful review of all admissible evidence and testimony, the Court finds that the severe angles of the river and current directions as depicted in this exhibit conflict with the well-established description provided by Judge Keady in Petition of Canal Barge Co., supra, as well as the credible testimony of Captains Rushing, Beacom, Johnson, and Hoelscher; all inland riverboat captains with considerable experience on the UMR including the St. Louis Harbor. Even President Casino's mariner experts, Captains Sam Schropp and James Jamison corroborated the direction of the significant sets as described by Judge Keady. The only expert testimony supporting President Casino Exhibit Z-11 was that of Dr. Charles Morris. Dr. Morris assumed the currents shown in President Casino Exhibit Z-11 were correct without performing any independent study of the currents. He offered testimony based on an assumed accuracy of President Casino Exhibit Z-11 without having ever been on a towboat, especially one navigating on the UMR northbound through the St. Louis Harbor. Finally, this exhibit fails to comport with the description of the St. Louis Harbor and its currents/sets as set forth by the Coast Guard in President Casino Exhibits 14 (St. Louis Harbor StudyโEffects of River Stage, Horsepower, Time of Day, Pilot Familiarity and Pilot Ability on Safety of Navigation in St. Louis Harbor, May 1986-November 1986) and X3 (Analysis of Bridge Collision Accidents in Saint Louis Harbor, April 1985).

*1083 Eads Bridge

The Eads Bridge, located at Mile 180, has three spans supported by four piers. The center or channel span is the customary navigation span. It is approximately 520 ft. in width and, at flood stage, has a vertical clearance of 66 ft. 6 in. Each pier is marked with a red pier light. Two green lights (dayboard lights) mark the center of the channel span, one on the upstream (northbound) side and one on the downstream (southbound) side. There are also three white lights in a vertical line located above the green lights on both the upstream and downstream side. Of all the bridges in the St. Louis Harbor, the Eads Bridge is considered to be the most hazardous to navigate, especially during high or flood waters, due to the limited horizontal clearance of the channel span.

M/V ANNE HOLLY's Northbound Voyage on the UMR through the St. Louis Harbor on April 4, 1998
On March 30, 1998 the M/V ANNE HOLLY, under the command of Capt. John (Johnny) Johnson, proceeded southbound on the UMR from MacGregor, Iowa to St. Louis with a tow of twelve (12) loaded barges. Due to high water conditions, Capt. Johnson had radioed Lamb earlier that he would take a tow of twelve (12) loaded barges, not fifteen (15) loaded barges as originally planned.
The M/V ANNE HOLLY arrived north of St. Louis the night of April 3, 1998. In effect at that time was a Coast Guard notice restricting navigation between Mile 184 through Mile 179 on tows longer than 600 ft. from proceeding south through the St. Louis Harbor except in daylight hours. The M/V ANNE HOLLY, with Capt. Johnson piloting, waited until the early morning hours to continue proceeding southbound through the St. Louis Harbor. Capt. Johnson did not encounter any problems due to the water being at flood stage[9], such as large amounts of drift (river debris), while navigating southbound through the St. Louis Harbor.
After dropping off its tow, the M/V ANNE HOLLY got its new tow orders by fax from East Side. Throughout the afternoon of April 4, 1998, the M/V ANNE HOLLY built its northbound tow of fourteen (14) barges by first picking up three (3) barges (1 loaded, 2 empty) from the Lewis & Clark fleet at UMR Mile 175. It then proceeded north to the George Street fleet at UMR Mile 177 to pick up the remaining eleven (11) barges. Although Capt. Hoelscher was piloting the M/V ANNE HOLLY at this time, Capt. Johnson determined the configuration of the northbound tow. The northbound tow was a mix of eleven (11) box barges and three (3) rake barges. Capt. Johnson placed the loaded heavier barges toward the rear for better steerage. Two rake barges were placed at the head of the tow as the port and center lead barges. The third rake barge was placed in the starboard string immediately ahead of a loaded box barge. Two empty box barges were placed in front of the rake load in the starboard string. This configuration, although not the best for "optimal" pushing capability, was consistent with marine industry practice and afforded the best possible configuration for this tow. The vessel and its tow was approximately 1154 ft. long and 105 ft. wideโfive (5) barges long in the port string, five (5) barges long in the center string, and four (4) barges long in the starboard string. See, Attachment 1.[10] Among the barges in the tow during the *1084 northbound UMR trip were: Claimant Pinnacle Barge Co. barges PIN 348B and PMC 8101B; Claimant Brennan Marine barges MW0211 and ABC 767; Claimant Riverland Resources barge SB 15B; and Claimant Robert B. Miller & Associates barges RM 41, CGB 219, and ITEL 206.
Prior to leaving the George Street fleet and pushing the fourteen (14) barge tow upriver, Captains Johnson and Hoelscher conferred regarding the tow configuration, navigation conditions, and the capability of the M/V ANNE HOLLY to successfully navigate the St. Louis Harbor northbound. Both were well-aware of the Coast Guard's latest notice restricting southbound traffic to daylight hours only, and that all towboats navigating the St. Louis Harbor (southbound and northbound) had to have a minimum of 250 hp. for every loaded barge (1500 tons) in tow.[11] They both felt that there would be no problem with the M/V ANNE HOLLY pushing the tow northbound through the St. Louis Harbor.
As the M/V ANNE HOLLY was preparing to pull out from the George Street fleet, the M/V FRANCES was headed southbound towards the George Street fleet. The M/V FRANCES, under the command of Capt. Ken Simmons, a veteran inland riverboat captain with twenty (20) years experience piloting the St. Louis Harbor, was the only Paragon Marine Service harbor boat working the night shift on April 4, 1998 due to a pilot's strike. At approximately 6:15 p.m., Capt. Simmons observed the M/V ANNE HOLLY and her tow at the George Street fleet. He called Capt. Johnson, whom he had known for many years from towing barges up and down the UMR through the St. Louis Harbor, and inquired as to whether he would need any assistance in getting his tow underway. Capt. Johnson responded that everything was fine and he did not require assistance. Capt. Simmons ended the brief conversation by informing Capt. Johnson that the M/V FRANCES was headed northbound to assist a barge in leaving a dock facility, and he would be returning southbound with the barge to a lower anchor fleet on the Illinois side of the river opposite the George Street fleet.
At 6:30 p.m. Capt. Johnson logged out and the M/V ANNE HOLLY got underway. All navigational lights, including the search lights and the peep light, were operational. It took approximately fifteen (15) minutes for Capt. Johnson to release his tow from the fleet and maneuver out into the river. Upon departure, and for some time upriver, the deck crew remained on the tow stringing out sounder cords and checking the tightness of the rigging securing the tow. They also watched for any problems with the barges or with the river. For safety reasons, as the tow approached each bridge, Capt. Johnson would call the deck crew off the tow.
As the M/V FRANCES proceeded southbound with its barge in tow, Capt. Simmons observed the M/V ANNE HOLY at Mile 178.1 headed northbound approaching the Cahokia Power Plant located at Mile 178.5. The river was above flood stage and Capt. Simmons could see moderate to heavy drift in the river. Captains Simmons and Johnson spoke on (radio) Channel 13 to agree to a "passing arrangement". They agreed to pass "port to port". At approximately 7:15 p.m., the tows passed each other at Mile 178.5 without any problems. Capt. Simmons clearly saw the M/V ANNE HOLLY's navigational or "running lights" were functioning properly. He estimated the speed of the M/V ANNE HOLLY's speed over the *1085 ground to be "a good three miles an hour". He saw nothing unusual about her, the tow, or her navigation path northbound.
Both vessels proceeded on course. The next time the two captains spoke was shortly before 7:30 p.m. Upon passing through the MacArthur Bridge and Poplar Street Bridge, Capt. Johnson radioed Capt. Simmons to inquire about the availability of a tug to provide assistance if he should require assistance as he continued upriver. Capt. Simmons informed him that no tug was presently available because he was the only tug working the area. Capt. Johnson responded that he was not having any difficulty pushing through the bridges and wouldn't be needing a helper tug. Capt. Simmons did not detect any concern or anxiety on the part of Capt. Johnson during their brief conversation.
Capt. Johnson continued northbound having had no problems pushing the M/V ANNE HOLLY through the MacArthur and Poplar Street bridges. Since the force of the current is stronger at these two bridges than at the Eads Bridge, he figured that if he had no problem pushing his tow through those two bridges, he would encounter no problems pushing the tow through the Eads Bridge. After the M/V ANNE HOLLY and her tow had proceeded through the center spans of the MacArthur and Poplar Street bridges, she continued upriver with the jack staff of the tow pointed toward the left descending pier of the Eads Bridge. Capt. Johnson maintained a position between the dayboard marking the right ascending side of the channel span and the Illinois pier of the channel span. This positioning placed the M/V ANNE HOLLY and her tow on the Illinois side of the river.
As the M/V ANNE HOLLY approached the Eads Bridge closer to its Illinois side, Capt. Johnson made a port steer about 400 ft. below the bridge in order to bring the boat and tow perpendicular with the bridge as the tow proceeded through it. This was to enable the M/V ANNE HOLY to turn into the current coming through the channel span.
As the first tier of barges cleared the bridge, Capt. Johnson noticed a slight vibration. As the second tier of barges cleared the bridge, Capt. Johnson noticed that not only had the vibration continued but that the pace upriver was slowing. He radioed Chief Engineer Brown to check on the engines. He wanted to know if the engines were operating at their maximum rpms. Chief Brown checked the engines with a new hand-held tachometer and informed him that the port main engine rpms were 904 and the starboard engine rpms were 900. These readings were entered into the engine room's log. These rpm readings indicated that the M/V ANNE HOLLY was running (at the least) at her rated horsepower of 5600.
As the third tier of barges proceeded through the Eads Bridge, the tow of the M/V ANNE HOLLY "stalled out". With the forward momentum of the tow stopped, combined with the strength of the current along the starboard side of the tow, the tow began to move toward the right descending (Missouri) pier of the Eads Bridge. Capt. Johnson pulled back the throttles, knocked the boat out of gear, tried to radio the ADMIRAL of his situation (failed to get an immediate response), and finally, attempted to land the tow on the Missouri pier of the Eads Bridge as "gently" as possible. At this point, contact with the bridge was inevitable; it was just a question of the force of the impact. Capt. Johnson hoped to keep the tow intact as the stern of the third barge from the head of the port string allided [12] with *1086 the right descending bridge pier. When the tow allided with the bridge (at approximately the break coupling), the wires holding the tow together parted and the eight (8) barges which were positioned in the tow between the break coupling and the head of the tow topped around and floated downstream in the current.
Capt. Johnson logged the allision with the Eads Bridge at 7:30 p.m. He broadcasted a "May-Day" call on Channel 13 and then radioed the United States Coast Guard Group UMR in Keokuk, Iowa. Capt. Simmons heard the "May-Day" call and started immediately northbound while attempting to reach Capt. Johnson on the radio. As Capt. Simmons approached the lower end of the MacArthur Bridge, he spotted the ADMIRAL topping out. One of the runaway barges had hit the ADMRAL'S bow causing damage to the bow and her moorings to break loose. This resulted in the ADMIRAL drifting from the Missouri shore into the river where she topped around in the swift current. A second barge hit an entry ramp that had already broken loose and was submerged in the water.
As he saw the ADMIRAL topping out, Capt. Simmons called Capt. Johnson and instructed him to release his remaining tow and go assist the ADMIRAL. Capt. Johnson maneuvered the M/V ANNE HOLLY quickly downriver to face up the bow of the ADMIRAL and hold her in place. The crew of the M/V ANNE HOLY boarded the ADMIRAL and assisted off-loading her patrons.
Meanwhile, the M/V FRANCES assisted in catching the runaway barges. Capt. Simmons noted the time he began his emergency efforts as approximately 7:30 p.m. in his vessel and pilothouse logs.[13] Besides the ADMIRAL, several of the barges sustained damage to themselves or their cargo as a result of the allision(s) on April 4,1998.

Post April 4, 1998 Events
Following the allision(s) of April 4, 1998, the National Transportation and Safety Board (NTSB) and the Coast Guard initiated investigations. The NTSB interviewed numerous individuals on a "factfinding" mission to try to establish a probable cause for the accident. Meanwhile, the Coast Guard, as the licensing authority for inland river towboat pilots, charged Capt. Johnson with negligence for "[flailing to take adequate precautions to prevent an allision of subject vessel's tow [M/V ANNE HOLLY] with the Eads Bridge near mile 180.0 on the Upper Mississippi Riverโa navigable water of the United States." At his license suspension and/or revocation hearing on September 3, 1998, Capt. Johnson pleaded "no contest" to the charge of negligence and the Coast Guard suspended his riverboat pilot's license for two (2) months, remitted on six (6) months probation.
Also, four days after the subject allision(s), the M/V ANNE HOLLY successfully towed a fifteen (15) barge tow (twelve loaded and three empty) northbound through the St. Louis Harbor in river conditions similar to the ones existing on April 4, 1998 (flood stage and drift present). This time the M/V ANNE HOLLY was piloted by Capt. Harvey through the St. *1087 Louis Harbor, including the Eads Bridge. A videotape of the M/V ANNE HOLLY's run on April 8, 1998 (American Milling Exhibit 80)[14] shows Capt. Harvey's approach to the Eads Bridge to be virtually identical to the approach testified to by Capt. Johnson. Tachometer readings of the M/V ANNE HOLLY's engines recorded identical rpms: 904 rpms for the port engine and 900 rpms on the starboard engine. The computations and recordings logged by Chief Engineer Brown indicate the speed of the M/V ANNE HOLLY on April 8, 1998 was 3.64 mile per hour. No repairs or adjustments were made to any of the M/V ANNE HOLLY's machinery between April 4, 1998 and April 8, 1998.

CONCLUSIONS OF LAW
This Court has jurisdiction over this case pursuant to its admiralty and maritime jurisdiction, 28 U.S.C. ง 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. Furthermore, American Milling and Winterville have invoked this Court's admiralty and maritime jurisdiction pursuant to the Limitation of Liability Act, 46 U.S.C. งง 183 et. seq. Both American Milling and Winterville seek to exonerate themselves from liability, or in the alternative, to limit their liability with respect to the allision with the Eads Bridge, and subsequent allision by the M/V ANNE HOLLY's barges with the ADMIRAL. Captain John Johnson seeks to exonerate himself from the President Casino and Barge Claimants' charge of negligence in connection with the events of April 4, 1998.[15]
The present case involves complicated mixed questions of law and fact. There are several legal theories of liability that may apply, and as explained below, each involving certain maritime presumptions and shifting burdens of proof. Further complicating this case is the fact that two (2) allisions took place the evening of April 4, 1998, each requiring an independent analysis. However, for the sake of clarity and ease of presentation, this opinion will first set forth the certain general admiralty principles present in the case in total, then address the application of these principles with regard to the issue of exoneration or limitation of liability. For the most part, the allision of the M/V ANNE HOLY with the Eads Bridge will be dealt with first, then the allision of the barges with the ADMIRAL.
Liability for allisions/collisions is governed by a collection of legal presumptions and shifting burdens of proof.[16] The mere occurrence of an allision does not automatically impart liability to the vessel or her owner. Turecamo Maritime v. Weeks Dredge No. 516, 872 F.Supp. 1215, 1229 (S.D.N.Y.1994). Liability requires a *1088 finding of "fault" that caused or contributed to the damage incurred. Id, at 1229. Liability in admiralty collision cases generally stem from the following sources: 1) negligence in the navigation or deviation from generally accepted concepts of prudent seamanship and reasonable care; 2) violation of statutory and/or regulatory rules governing navigation and management of vessels (and other maritime structures such as bridges over navigable waters); and 3) non-compliance with wellestablished, recognized customs or practices in the marine industry. Folkstone Maritime Ltd. v. CSX Corp., 64 F.3d 1037, 1046 (7th Cir.1995). Whatever the source of the liability, the "fault" must have been a contributing cause of the incident. Folkstone Maritime, at 1046; Lone Star Industries v. Mays Towing, 927 F.2d 1453 (8th Cir.1991).
As stated before, the "fault" which produces liability must be the proximate cause of the allision/collision. To give rise to liability, the culpable act or omission must have been substantial and a material factor in causing the collision. American River Trans Co. v. KAVO KAIAKRA S.S., 148 F.3d 446 (5th Cir.1998). Whether an act is the proximate cause of a collision depends on two factors: 1) the existence of a direct causal nexus between the negligent act or omission; i.e. the harm would not have occurred "but for" the act; and 2) whether the resulting harm was a "natural" and "probable" consequence of the act or omission. See, Horn v. B.A.S.S., 92 F.3d 609, 611-12 (8th Cir. 1996). If an intervening act breaks the chain of causation, then it is considered to be a "superceding cause" and cuts off the liability of the first negligent act. See, Exxon Co. v. Sofec, 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996)(finding that superceding cause applies in admiralty when a party's "negligence in fact substantially contributed to the plaintiffs injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."); see also, Lone Star Industries, supra. Thus, not all intervening acts are considered to be superceding. If an intervening act does not break the causal nexus, a court can hold both actors liable for the resulting injury.
Maritime law recognizes certain legal presumptions in order to assist a court in determining the proximate cause of an allision/collision and imposing liability for the allision/collision. As in any civil case, the injured party in an admiralty case has the initial burden of proving by a preponderance of the evidence that the defendant vessel was negligent and that this negligence was the proximate cause of the injury. It is well-established that when a moving vessel collides with an anchored vessel or a fixed object (such as a bridge), there is a presumption that the moving vessel is at fault. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); The Louisiana, 70 U.S. (3 Wall.) 164, 18 L.Ed. 85 (1865); Bunge Corp. v. Freeport Marine Repair, 240 F.3d 919, 923 (11th Cir.2001); Bunge Corp. v. M/V FURNESS BRIDGE, 558 F.2d 790, 794-95 (5th Cir. 1977); Petition of M/V ELAINE JONES, 480 F.2d 11, 17 (5th Cir.1973); Claim of Gypsum Carrier, 465 F.Supp. 1050, 1061-62 (S.D.Ga.1979).[17] This presumption is enough to make a prima facie case of negligence against the moving vessel. Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724, 726 (5th Cir.1967); Gypsum Carrier, at 1061-62; Canal Barge as owner & operator of the M/V ELAINE JONES, 323 F.Supp. 805, 819 (N.D.Miss.1971). The burden of proof shifts to the moving vessel which can rebut the presumption only by proving 1) that it was without fault (i.e., used all *1089 reasonable care to avoid the collision); 2) the stationary object was at fault; or 3) the allision/collision was the result of an "inevitable accident". Bunge Corp. v. Freeport Marine Repair, at 923; Illinois Constructors Corp. v. Logan Transportation, 715 F.Supp. 872, 879 (N.D.Ill.1989); Bunge Corp. v. M/V FURNESS BRIDGE, at 795. The presumption operates not only against the moving vessel, but against all parties involved in the management of the vessel. Bunge Corp. v. Freeport Marine Repair, at 923.
Another rebuttable legal presumption that regularly governs maritime cases is known as the "Pennsylvania rule". Under the Pennsylvania rule, if a vessel involved in a collision was in actual violation of a statutory or regulatory rule intended to prevent collisions, the burden shifts to the violating vessel to show that its statutory fault was not a contributing cause of the accident. The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873); Alter Barge Line, Inc. v. TPC Transportation Co., 801 F.2d 1026, 1028 (8th Cir.1986); Ingram Barge Co. v. Valley Line Co., 470 F.Supp. 140, 147 (E.D.Mo. 1979), aff'd 615 F.2d 1365 (8th Cir.1979); Three Rivers Rock Co. v. The M/V MATIN, 401 F.Supp. 15, 18 (E.D.Mo.1975). Although the Pennsylvania rule originally applied only to collisions between ships, it is now applicable in all maritime accidents. See, In the Matter of Adventure Bound Sports, 837 F.Supp. 1244, 1253 n. 14 (S.D.Ga.1993) (citations omitted); see also, Folkstone Maritime, supra, (applying Pennsylvania rule to allision between vessel and drawbridge); Complaint of Wasson, 495 F.2d 571 (7th Cir.1974)(applying Pennsylvania rule to allision between boat and bridge); United States v. Norfolk-Berkley Bridge Corp., 29 F.2d 115 (E.D.Va.1928)(applying Pennsylvania rule to allision between towed vessel and bridge). For the Pennsylvania rule to apply, three factors must be proven: 1) proof by a preponderance of the evidence of a violation of a statute or regulation that imposes a mandatory duty; 2) the statute or regulation must involve marine safety or navigation; and 3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. Union Pacific Railroad Co. v. Kirby Inland Marine, Inc. of Mississippi 296 F.3d 671, 674 (8th Cir.2002); Folkstone Maritime, at 1047. Although the rule (as originally set forth in The Pennsylvania, supra.) refers to a statutory violation, it is commonly applied to violations of navigational rules.[18]Turecamo Maritime, supra. The Pennsylvania rule may be rebutted by a showing that the violation was not a contributing cause of the injury; i.e. the other party is solely responsible for the accident. See, Folkstone Maritime, at 1047; Alter Barge Line, at 1029; Consolidated Grain and Barge v. Wisconsin Barge Line, 522 F.Supp. 842 (E.D.Mo.1981). Thus, when the stationary object that has been struck by the moving vessel is in violation of a navigational statute or rule intended to prevent such an allision, the usual presumption of fault that attaches to a moving vessel under the Oregon rule is shifted back to the stationary object under the *1090 Pennsylvania rule, and the stationary object must prove that its failure to comply with the statute or rule could not have contributed to the injury.
Another legal presumption applicable in maritime cases is the doctrine of res ipsa loquitur. Res ipsa loquitur creates a rebuttable presumption of negligence in certain instances where: 1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of the type that ordinarily does not occur in the absence of negligence. Lone Star Industries v. Mays Towing Co., at 1456-58 citing Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932) and Agri-Trans Corp. v. Peavey Co., 742 F.2d 1137, 1139 (8th Cir.1984); American River Transportation v. Paragon Marine Services, 213 F.Supp.2d. 1035, 1058 (E.D.Mo.2002), aff'd 329 F.3d 946 (8th Cir.2003).
Under the Limitation of Liability Act, a vessel owner[19] is entitled to exoneration only if the vessel and its owner are free from fault or negligence in the allision. American River Transportation v. Paragon Marine Services, at 1063 citing Muer v. Karbel, 146 F.3d 410, 414 (6th Cir.1998); see also, Illinois Constructors Corp., at 880. Otherwise, a court must engage in a two-step analysis to determine if a vessel owner is entitled to limit his or her liability under the Act. Firstly, the court must identify what acts of negligence or conditions of unseaworthiness caused the allision; and secondly, the court must determine whether the ship owner had privity or knowledge of the said acts or conditions which caused the allision. In the Matter of the Complaint of Hercules Carriers, 768 F.2d 1558, 1563 (11th Cir. 1985) (citations omitted); Empresa Lineas Maritimas Argentinas, S.A v. United States, 730 F.2d 153, 155 (4th Cir.1984); American River Transportation v. Paragon Marine Services, at 1063 citing In re Cleveland Tankers, 67 F.3d 1200,1203 (6th Cir.1995); Illinois Constructors Corp., at 880. The initial burden of proving negligence or unseaworthiness rests with the claimants. Once the negligence or unseaworthy condition is proven, the burden shifts to the shipowner to prove the lack of privity or knowledge. Hercules Carriers, at 1564; American River Transportation v. Paragon Marine Services, at 1063; Illinois Constructors Corp., at 879-80.

Allision with the Eads Bridge
In the present case, the presumption of fault established by the Oregon rule existsโit is undisputed that on the evening of April 4, 1998, the M/V ANNE HOLLY hit the Eads Bridge. American Milling and Winterville[20] argue that the Oregon rule presumption of fault is overcome by their claim that the allision was the result of a "stall-out" caused by drift in the flanking rudders and/or struts forward of the propellers. They contend that the *1091 presence of drift was unforeseeable; thus, the allision was the result of an "inevitable accident", and therefore, they should be entitled to exoneration from liability for the allision.
An accident is "inevitable" or "unavoidable" not only by an act of God, but also when all reasonable precautions to be required have been taken, and the accident still occurs. Atkins v. Lorentzen, 328 F.2d 66, 69 (5th Cir.1964); Gypsum Carrier, at 1062; M/V ELAINE JONES, 323 F.Supp. at 819. "`Inevitable accident' is not as much a true defense as it is a convenient label expressing the idea that once a presumption of negligence arises the burden shifts to the presumptively negligent party to come forward with proof that the accident in no way resulted from its own lack of due care." M/V ELAINE JONES, 480 F.2d. at 17-18, citing Atkins v. Lorentzen, supra. The burden of proving inevitable accident rests heavily upon the vessel asserting such defense; a finding of inevitable accident should not be arrived at lightly; and, the party asserting the defense must affirmatively establish that the accident could not have been prevented. American River Transp. v. Paragon Marine Services, at 1061 (citations omitted); see also, Bunge Corp. v. Freeport Marine Repair, at 926; Mid-America Transportation Co. v. Rose Barge Lines, 347 F.Supp. 566, 572 (E.D.Mo.1972); M/V ELAINE JONES, 323 F.Supp. at 819.
Both Captains Johnson and Simmons testified to the presence of drift in the river on the evening of April 4, 1998. However, neither captain experienced any problems navigating the St. Louis Harbor southbound either on April 3 or 4, 1998. Furthermore, the M/V FRANCES had no problems with drift while navigating the St. Louis Harbor northbound on April 4, 1998. Captain Rushing testified that although drift is expected in high water, it is usually more of a problem with an empty tow, than a loaded tow. On April 8, 1998 the M/V ANNE HOLLY, with a 15 barge tow under the command of Captain Harvey, navigated the St. Louis Harbor northbound through the Eads Bridge without any problems despite the similar high waters and presence of drift. There was no presence of drift in the rudders or engines of the M/V ANNE HOLLY following the events of April 4,1998.
Upon review, the Court finds that American Milling, Winterville, and Capt. Johnson have failed to rebut the Oregon rule presumption of negligence. They simply have failed to put forth any affirmative evidence that drift caused the allision with the Eads Bridge. It is a huge leap of speculation to go from sighting drift in the river to the M/V ANNE HOLLY's engines stalling and the tow hitting the bridge. Such speculation is not sufficient to carry the heavy burden of proof necessary to show that the allision of the M/V ANNE HOLLY with the Eads Bridge was an "inevitable accident".
Having found that American Milling and Winterville are not entitled to exoneration from liability for the allision with the Eads Bridge, the Court now turns its attention to the question of limitation of liability. The Court must consider whether the claimants have met their initial burden of proving negligence or unseaworthiness.
President Casino[21] asserts that the allision was the result of Captain Johnson's *1092 negligence in making up the tow, choosing to proceed northbound through the St. Louis Harbor in high water, and navigating the M/V ANNE HOLLY. It further contends that the M/V ANNE HOLLY was unseaworthy because Captain Johnson was incompetent to pilot the M/V ANNE HOLLY through the Eads Bridge, the M/V ANNE HOLLY lacked the horsepower to transit the Eads Bridge, and the M/V ANNE HOLLY lacked a functioning "peep light".[22]
The test and standard for a finding of negligence is reasonable care under the circumstances. Folkstone Maritime, at 1046 citing Weyerhaeuser Co. v. Atropos Island, 777 F.2d 1344, 1351 (9th Cir.1985); Shappert Engineering Co. v. Steel City Marine, 620 F.Supp. 1377 (E.D.Mo.1985). Reasonable care is adjudged from a mariner's standpoint; i.e. whether due nautical care and prudence was exercised. Folkstone Maritime, at 1046 citing The Jumna, 149 F. 171, 173 (2nd.Cir.1906). The law does not require an extreme degree of care or the "highest degree of caution", nor does an error of judgment automatically impute fault if such error was within the ordinary standard of good and prudent seamanship. Folkstone Maritime, at 1046 citing The W.H. Baldwin, 271 F. 411, 413 (2nd.Cir.1921) and The H.F. Dimock, 77 F. 226, 229-30 (1st.Cir.1896); see also, The Grace Girdler. 7 Wall. 196, 74 U.S. 196, 203, 19 L.Ed. 113 (1868)("The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstancesโsuch as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in viewโthe safety of life and property."). "The vessel and those charged with her care are not obligated to foresee and provide against every possible accident that might occur at sea. The navigator is held responsible for only that which is known or should have been known, but no more." 9 U.S.F.Mar.J. 225, 236.
As previously stated, the claimants have the initial burden of showing negligence or unseaworthiness on the part of the M/V ANNE HOLLY. This burden has been initially met by the presumption of negligence arising under the Oregon rule. However, negligence does not necessarily mean fault for the allision. There still remains the issue of the alleged acts of negligence and/or unseaworthiness, and American Milling and/or Winterville's liability for such acts.
"It is the owner's duty to use due and proper care to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity.
.....
Seaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion. The burden to prove seaworthiness and the exercise of due diligence to make the ship seaworthy is upon the vessel owner or operator."
Complaint of Tug Ocean Prince, 584 F.2d 1151, 1155 (2nd.Cir.1978) (citations omitted). Thus, because a shipowner has a nondelegable duty to provide a competent *1093 master and crew, unseaworthiness can be linked to the insufficient manning of the vessel or an inadequately trained crew. Hercules Carriers, at 1566; see also, American Home Assurance v. L & L Marine Service, 875 F.2d 1351, 1354 (8th Cir. 1989). Furthermore, unseaworthiness "may also result from improper maintenance of equipment or other related failures which make the vessel ill-suited for its duties at sea." Hercules Carriers, at 1566. Whatever the source of the unseaworthiness, the acts of negligence or conditions of unseaworthiness must still be a contributory and proximate cause of the allision in order to produce liability. Hercules Carriers, at 1566.
As the M/V ANNE HOLLY's master and pilot, Capt. Johnson was chargeable with knowledge of all navigational conditions reasonably ascertainable by mariners experienced in navigating a particular waterway. Illinois Constructors Corp., at 881; Valley Towing Service as Owner of the M/V CITY OF GREENVILLE, 629 F.Supp. 139, 145 (E.D.Mo. 1985); Gypsum Carrier, 465 F.Supp. 1050, 1062 (S.D.Ga.1979). Thus, Capt. Johnson was chargeable with knowing all the navigational conditions reasonably ascertainable that would affect his navigation of the M/V ANNE HOLLY northbound through the St. Louis Harbor during flood stage with a tow of 14 barges.
The undisputed testimony at trial was that Capt. Johnson determined the make-up of the tow. The make-up of the tow was consistent with industry practice and both Capts. Schropp and Rushing testified that the make-up of the tow was acceptable. Furthermore, Capt. Johnson had many years of experience in navigating the St. Louis Harbor, and had taken larger tows upriver in flood stage. There was no credible evidence at trial that the make-up of the tow proximately caused the allision with the Eads Bridge. As a duly licensed experienced inland riverboat captain and pilot, the Court finds no reason to challenge Capt. Johnson's complete discretion to place the barges into any configuration that he deemed safe for navigation. See, American Commercial Lines v. U.S., 590 F.Supp. 816, 819-20 (E.D.Mo.1984), judgment vacated in part on other grounds sub. nom., 781 F.2d 114 (8th Cir. 1985).
Next, the claimants fault Capt. Johnson for deciding to proceed northbound through the St. Louis Harbor on the evening of April 4, 1998. Capt. Johnson was very familiar with the St. Louis Harbor and had successfully navigated it, northbound and southbound, on numerous prior occasions. He was well aware of navigational conditions of the harbor, having navigated it southbound that very morning. He was well aware of the Coast Guard restrictions for northbound traffic and the 5600 h.p. M/V ANNE HOLLY with 12 loaded and 2 empty barges was in compliance with the restriction. He had consulted with Capt. Hoelscher, another duly licensed and experienced inland river captain and pilot, about proceeding northbound in flood stage and both agreed that the M/V ANNE HOLLY was capable of pushing its tow upriver, including navigating the Eads Bridge. There was no indication at the time that the M/V ANNE HOLLY could not generate the speed necessary to push her tow upriver, in flood stage, through the St. Louis Harbor. It was neither unreasonable or negligent for Capt. Johnson to decide to proceed with his tow northbound on April 4, 1998.
Capt. Johnson's navigation through the St. Louis Harbor presents a more difficult problem to assess. Upon review of all the testimony by those most familiar with actually navigating the St. Louis Harbor, it appears to this Court that no one found fault with Capt. Johnson's navigation *1094 through the St. Louis Harbor until he was approximately 400-600 ft. below the Eads Bridge. Capt. Johnson testified that once he had cleared the Poplar Street Bridge, he approached the Eads Bridge with his tow pointed toward the left descending pier of the Eads Bridge; this placed his boat and tow on the Illinois side of the river. He further testified that as he entered the channel span, he did not make any radical rudder movements and used three to four (3-4) degrees of rudder to turn his tow and keep it steady in the current.[23] Capts. Rushing and Jamison agreed that Capt. Johnson's approach was proper.[24] Capt. Schropp agreed that Capt. Johnson's approach was proper up to approximately 400 ft. below the Eads Bridge. The dispute between these two veteran riverboat captains is when to apply port steer to the rudder and how hard to apply port steer. Capt. Schropp opines that the stall was caused by Capt. Johnson applying a hard port steer (5-10 degrees) approximately 400 ft. below the Eads Bridge; whereas, Capt. Schropp would make a "softer" port steer 800-1000 ft. below the Eads Bridge.
On April 8, 1998 the M/V ANNE HOLY successfully navigated the Eads Bridge northbound in flood stage with a differently configured tow. Capt. Harvey had the engines at the same horsepower and was traveling at the comparable speed of approximately 3 mph. One significant difference was that Capt. Harvey had to make a hard starboard rudder steer in order to compensate for an extremely strong and fast current that was drafting the vessel toward the Missouri side. He had to make this type of steer in order to get the head of the tow pointed straight into the current running downriver through the Eads Bridge channel span.[25]
Although it is reasonable to assume that the differences in the make-up of the tow could account for the unsuccessful transit on April 4, 1998 and the successful transit on April 8, 1998, the more reasonable explanation would be the difference in navigating to compensate for the strength of the draft towards the Missouri shore.
After listening to the experts on all sides, the Court is convinced that the M/V ANNE HOLLY was equipped to navigate northbound through the St. Louis Harbor. She had successfully navigated the St. Louis Harbor several times, northbound and southbound, with tows similar to the one in question. There was no indication whatsoever during her prior voyage of any problems associated with her engines. She possessed the requisite horsepower to successfully navigate the St. Louis Harbor. Both Capts. Johnson and Simmons testified *1095 that she was running at approximately 3-3.5 mph on the evening of April 4, 1998; and all the marine experts testified that this speed was sufficient to safely navigate the St. Louis Harbor, including the Eads Bridge. Chief Engineer Brown testified that her engines rpms were approximately 900, sufficient to maintain her rated horsepower of 5600 h.p.
President Casino further asserts that the M/V ANNE HOLLY was unseaworthy due to Capt. Johnson's negligence in failing to have a proper lookout. It contends that Capt. Johnson violated Rules 2 and 5 of the Inland Navigational Rules (INR). 33 U.S.C. งง 2002, 2005.
Rule 2 of the INR, 33 U.S.C. ง 2002, provides in pertinent part:
Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
See also, Inland River Towing v. American Commercial Barge Line Co., et. al., 143 F.Supp.2d. 646, 649 (N.D.Miss.2000)(referring to Rule 2 of the INR).
Rule 5 of the INR, 33 U.S.C. ง 2005, provides in pertinent part:
Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and risk of collision.
See also, Nehus v. Alaska Marine Towing, et. al., 519 F.Supp. 328, 331 (W.D.Wash.14981)(referring to Rule 5 of the INR).
The credible evidence at trial indicates that the M/V ANNE HOLLY's navigational lights, including the peep light[26], were functioning at the time of the allision with the Eads Bridge. Captains Johnson and Simmons both testified that the navigational lights were on while the M/V ANNE HOLLY was navigating northbound through the St. Louis Harbor on the evening of April 4, 1998. Deckhands Martin O'Connor and William Johnson both testified that the peep light was on when the tow left the Eagle Fleet. O'Connor Deposition, pgs. 106-07; W. Johnson Deposition, pgs. 93-4, 129, 131-33. The overwhelming weight of the evidence was that the navigational lights, including the peep light, were burning on the evening of April 4, 1998.
Furthermore, even if this Court were to find that the peep light was not functioning the evening of April 4, 1998, the evidence produced shows that the violation did not cause the allision nor was a contributory factor for the allision. The unrebutted evidence at trial established that Captain Johnson, at all times, had an unobstructed view of the river from the elevated pilothouse. There was no evidence at trial that the absence of a peep light caused or contributed to the allision, nor was there evidence at trial that having the peep light in fact should have averted the allision. See, J.R. Atkins as owner of the M/V Martha Anne v. Lorentzen as owner of the S.S. Ceara, 328 F.2d 66, 72 (5th Cir.1964); Turecamo Maritime v. Weeks Dredge, No. 516, 872 F.Supp. 1215, 1232 (S.D.N.Y. 1994).
All the marine experts experienced with navigating the St. Louis Harbor northbound *1096 agreed that Captain Johnson's approach to the Eads Bridge was proper on the evening of April 4, 1998. Even President Casino's expert, Captain Schropp agreed that Captain Johnson's navigation of the harbor was fine until he was about 400 ft. below the Eads Bridge. The fact that the M/V ANNE HOLLY was capable of pushing a fifteen barge tow through the Eads Bridge four days later under similar river conditions is evidence that Capt. Johnson did not take all reasonable steps to avoid hitting the Eads Bridge. See, Canal Barge as owner of M/V ELAINE JONES, 323 F.Supp. at 819. The preponderance of credible evidence at trial was that Capt. Johnson underestimated the strength of the current as he headed under the bridge, the tow began to move too far toward the left descending pier and he was unable to compensate for it. The strength of the current and the need to steer properly to compensate for it is clearly shown in Exhibit 80 (the video of the M/V ANNE HOLLY's April 8,1998 northbound voyage through the St. Louis Harbor). The Court concludes that the allision of the M/V ANNE HOLLY was the result of a navigational error by Captain Johnson. As such, Capt. Johnson has failed to overcome the presumption of fault pursuant to the Oregon rule.
Capt. Johnson's negligence also suffices to establish that he violated Rule 2 of the INR. The Court finds that Capt. Johnson violated Rule 2 because, despite his knowledge and experience in navigating the UMR, especially the St. Louis Harbor, he failed to properly consider the strength of the current flowing under the Eads Bridge in light of the flood conditions, resulting in the negligent steering of the M/V ANNE HOLLY through the channel pier, and the subsequent allision with the Eads Bridge. The Court faults Capt. Johnson for failing to navigate the M/V ANNE HOLLY with due care under the circumstances existing on the evening of the allision with the Eads Bridge, in violation of Rule 2 of the Inland Navigational Rules. Consequently, Capt. Johnson has failed to overcome the presumption of fault pursuant to the Pennsylvania rule.
However, Captain Johnson's negligence does not render the M/V ANNE HOLLY unseaworthy because although negligent, Capt. Johnson was not incompetent to pilot the M/V ANNE HOLLY the evening of April 4,1998.
Captain Johnson has been an inland riverboat captain and pilot for almost thirty (30) years. He was extremely familiar with the St. Louis Harbor and had successfully navigated it, northbound and southbound, on numerous occasions. He was familiar with flood conditions on the UMR. In all these years of navigating the UMR, he had only one prior riverboat accident, some ten (10) years prior to the subject allision with the Eads Bridge. He had decided to make the northbound voyage on April 4,1998 after consultation with another riverboat captain and pilot of over twenty (20) years experience. His tow was permissible under the Coast Guard's Captain of the Port Order then in effect, and he was piloting a towboat he was very familiar with and knew to have the requisite horsepower to push a large tow. The allision was the result of a spontaneous navigational error, and not the result of any incompetence on the part of Capt. Johnson or any crewmember of the M/V ANNE HOLLY.
Moreover, even if the evidence adduced at trial was insufficient to support a finding of a specific negligent act, Capt. Johnson's negligence may be inferred pursuant to the application of the doctrine of res ipsa loquitur. The Eighth Circuit has recognized the applicability of the doctrine of res ipsa loquitur in admiralty cases. Lone Star Industries, Inc. v. Mays Towing Co., 927 F.2d 1453 (8th Cir.1991); *1097 American River Transportation Co. v. Paragon Marine Services, at 1058; see also, Agri-Trans Corp. v. Peavey Co., 742 F.2d 1137, 1138-39 (8th Cir.1984)(finding that negligence can be inferred from the facts in an admiralty collision case) citing Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); In re Complaint of Neva C. Parham, 336 F.Supp. 748, 752-53 (E.D.Ark.1971)(acknowledging that the doctrine of res ipsa loquitur has been held applicable in admiralty proceedings), aff'd 468 F.2d 719. The doctrine of res ipsa loquitur applies when 1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of the type that ordinarily does not occur in the absence of negligence. Lone Star Industries, at 1457; American River Transportation, at 1058. In the present case, the Court is satisfied that all three (3) res ipsa loquitur elements are satisfied. It is undisputed that the Eads Bridge did not contribute to the allision. Secondly, it is undisputed that the M/V ANNE HOLLY was in the exclusive control of Capt. Johnson at the time of the allision. Finally, the act of a moving vessel hitting a stationary bridge is not the type of event which normally occurs in the absence of negligence by the party having exclusive control of the moving vessel; i.e. the M/V ANNE HOLLY. Thus, each requisite element is satisfied and the application of the doctrine of res ipsa loquitur serves as an alternative basis for finding that the allision between the M/V ANNE HOLLY and the Eads Bridge on the evening of April 4, 1998 was the result of negligence on the part of Capt. Johnson.
Since the Court has found Capt. Johnson to have committed navigational error while piloting the M/V ANNE HOLLY on the evening of April 4, 1998, American Milling and Winterville are not entitled to exoneration from liability. However, having found that Capt. Johnson negligently navigated the M/V ANNE HOLLY, the issue now is whether American Milling and/or Winterville was negligent, and whether such negligence should limit their liability. President Casino contends that American Milling should not be entitled to limit its liability because it had knowledge or privity of Capt. Johnson's negligence. It further contends that Winterville is not entitled to limit its liability because it does not have standing under the Act as an owner, bareboat charterer, or pro hac vice owner of the M/V ANNE HOLLY. Finally, President Casino contends that, if the Court should allow Winterville to limit its liability, then Winterville should be held liable for an amount equal to the value of the vessel ($2.2.million) rather than the $20,500.00 Winterville has deposited into the limitation fund.
American Milling and Winterville seek to limit their liability for damages regarding the allision with the Eads Bridge pursuant to the Limitation of Liability Act, 46 U.S.C. ง 183. Under ง 183, a qualified party may limit his liability to the value of the vessel and the pending freight[27] if the damage was done without the privity or knowledge of the party seeking to limit liability. The Court has determined the act(s) of negligence that caused the allision with the Eads Bridge, now the Court must determine whether American Milling and/or Winterville had knowledge or privity of those same acts of negligence.
Before embarking on an analysis of whether American Milling and/or Winterville had knowledge or privity of the act(s) of negligence that contributed to the M/V ANNE HOLLY's allision with the Eads Bridge, it is first necessary to address the issue of standing to seek protection *1098 under the Act. A party seeking to avail itself of the protection of the Limitation of Liability Act, 46 U.S.C. ง 183 et. seq., must be either: 1) the owner or pro hoc vice owner of the vessel within the definition of ง 183(a); or 2) the bareboat charterer of the vessel within the definition of ง 186; or 3) an operator with significant management and operational control over the vessel, thereby, making the operator an implied charterer or pro hoc vice owner of the vessel. In the instant case, Winterville contends that by virtue of its management duties, it should be entitled to protection under the Limitation Act as an implied charterer or pro hoc vice owner of the M/V ANNE HOLLY.
The Limitation Act allows the owner of a vessel to limit its liability to the value of the ship and its pending freight if that owner is without knowledge or privity of the loss-causing negligent act or unseaworthy condition of the vessel. 46 U.S.C. ง 183. The Act does not define the term "owner". However, ง 183 was enacted to "encourage investments in ships and their employment in commerce", so that "the shipping interests of this country might not suffer in competition with foreign vessels." In the Complaint of Marine Recreational Opportunities, Inc., 15 F.3d 270, 271 (2nd Cir.1994) quoting American Car & Foundry Co. v. Brassert, 289 U.S. 261, 263, 53 S.Ct. 618, 77 L.Ed. 1162 (1933). Thus, the term "owner" is generally given a broad construction so as to achieve the congressional intent to promote marine shipping. In re Complaint for Exoneration From or Limitation of Liability of Shell Oil Company and Shell Offshore Inc. as Owners and lor Owners Pro Hoc Vice of M/V EBII, 780 F.Supp. 1086, 1089, n. 10 (E.D.La.1991) (citations omitted); see also, Calkins, as owner of the M/V Lucky One v. Graham, 667 F.2d 1292, 1294 (9th Cir. 1982) (citations omitted). In cases wherein a broad and liberal interpretation of the term "owner" is applied, the party purporting to fall under such interpretation had actual title of ownership or was capable of exercising some degree of possession and control over the vessel at the time of the accident so as to be considered an owner pro hoc vice.
"The term `owner' does not require title, but rather as a general rule, one who is subjected to a shipowner's liability because of his exercise of dominion over a [i.e., relationship to] the vessel should be able to limit his liability to that of an owner. More succinctly stated, the act is designed to cover one who is a `likely target' for liability claims predicated on his status as the person perhaps ultimately responsible for the vessel's maintenance and operation, (citations omitted) The rule that emerges from all of the cases interpreting ownership pursuant to Section 183 is that if the plaintiff in limitation may be held liable because of his ownership or control of the vessel, then he can maintain a limitation action." (citations omitted)
In re Exoneration from or Limitation of Liability of Shell Oil Co., at 1089-90.
The Limitation Act further provides that "[t]he charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels." 46 U.S.C. ง 186. Only a bareboat charterer is entitled to the protection of the Limitation Act, and only upon possession, command, and relinquishment of the vessel to the charterer. Complaint of Anheuser-Busch, Inc., 742 F.Supp. 1143, 1145-46 (S.D.Fla.1990). In essence, a bareboat charterer assumes control over the vessel's management and navigation becoming the owner pro hoc vice. Complaint of Anheuser-Busch, Inc., at 1146, n. 4.
*1099 In the present case, Winterville is in the business of ship management. It is neither the owner in title of the M/V ANNE HOLLY nor the demise/bareboat charterer of the vessel. However, in light of the broad range of "ownership" responsibilities it had as the manager of the vessel, the Court finds that it is entitled to invoke the Limitation Act under งง 183 and 186.
In re Petition of United States, 259 F.2d 608 (3rd Cir.1958), Mathiasen's Tanker Industries contracted with a United States naval agency to manage and operate tankers for the Navy. Mathiasen agreed to "equip, fuel, supply, maintain, man, victual and navigate" the subject tanker, and the government agreed to reimburse Mathiasen for costs. The Third Circuit Court of Appeals affirmed the District Court's conclusion that although the agreement made no mention of the term "charterer", Mathiasen had "exclusive control and management" of the tanker, and thus, fulfilled the requirements of a demise charterer and was entitled to seek limitation under the Act. In re Petition of United States, at 609-11. In fact, given Mathiasen's responsibilities in managing the tanker(s), the appellate court reasoned that "... Mathiasen's role under the contract partakes of the nature of both charterer and owner pro hac vice. Either status justifies its petition for limitation." Id, at 610.
In In re Complaint of Chesapeake Shipping, Inc. (Chesapeake Shipping II), 803 F.Supp. 872 (S.D.N.Y.1992), the district court found that a ship management company (Gleneagle Ship Management Co.) was the owner pro hac vice of the subject vessel because the company's responsibilities included: "manning the vessels; victualing the vessels; providing for navigation, which involved procuring and providing deck, engine, and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment ... and communicating with Chesapeake and the vessel's time charterers." Id, at 873-74. Relying upon Petition of United States, supra, the district court found that the ship management company had virtually the responsibility of the record owner, and qualified under ง 183. Chesapeake II, at 875; see also, Complaint of the National Shipping Company of Saudi Arabia, 147 F.Supp.2d. 425, 444 n. 8 (E.D.Va.2000)("The term `shipowner' as used in the statute [46 U.S.C. ง 183], has been construed to include a ship management company responsible for the operation of the vessel." See, In re Chesapeake Shipping, Inc., 803 F.Supp. 872, 874-75 (S.D.N.Y.1992)).
Also relying upon Petition of United States, supra., the district court in Complaint of B.F.T. No. Two Corp., 433 F.Supp. 854 (E.D.Pa.1977) found that a tug operator, that supplied its crew, fuel, insurance and work on behalf of the tug owner, was entitled to invoke the Limitation Act. The court compared the tug operator to Mathiasen, and held that both are "`engaged in the business of navigation' as operators of vessels owned by other concerns... [i]t is because of their status as operators that they are potentially liable for the negligence of the vessels, and it is because of their status as operators that they fall within the scope of the limitations statutes." Complaint of B.F.T. No. Two Corp., at 873.[28]
*1100 Interestingly, in Birmingham Southeast LLC, etal. v. M/V MERCHANT PATRIOT, 124 F.Supp.2d. 1327 (S.D.Ga.2000), the district court found that a ship management company did not qualify as a owner pro hac vice under ง 183 because it did not have the ownership attributes that Gleneagle had in Chesapeake Shipping II, supra In Birmingham Southeast, the ship management company did not have a written agreement in place at the time of the casualty. Although it hired and managed the crew of the M/V MERCHANT PATRIOT, it did not pay crew wages, or the expenses of the operation and maintenance of the vessel. It's management role was not "autonomous"; i.e. it was in constant contact with the vessel's owner regarding all aspects of the operation, including the crew, of the vessel. The district court found that at all times, the vessel's owner had "ultimate control of the vessel and crew." Birmingham Southeast, at 1339. Consequently, the district court found that the ship management company's involvement with the M/S MERCHANT PATRIOT did not rise to the status of owner pro hac vice and therefore was not entitled to seek the protection of the Limitation Act. Id., at 1339.
Similarly, the Ninth Circuit Court of Appeal, although noting that the "limitation of liability provision should be given broad construction so as to achieve Congress' purpose of inducing and encouraging investment in shipping", refused to bestow the status of owner pro hac vice upon the seller of a fishing vessel. Calkins v. Graham, 667 F.2d 1292, 1294-95 (9th Cir.1982). The plaintiff contended that he was the "owner" of the vessel within the meaning of ง 183 since he was "unquestionably the person who operated and managed the vessel," thus, making him the "likely target" for any legal claims concerning the boat. Id., at 1294. The appellate court noted that although the plaintiff had exclusive possession of the boat at one time, when the accident occurred (involving the vessel), the plaintiff no longer had possession or control of the vessel, nor was he responsible for the boat's maintenance and operation. Therefore, since Calkins was no longer in "exclusive possession and control of the vessel" and furthermore, no longer "responsible for the maintenance and operation" of the vessel, at the time of the accident, he was not a "likely target" for legal claims. Id, at 1294-95, The Ninth Circuit found that the term "owner" in ง 183 should encompass anyone whose relationship to the vessel might make him liable for damages involving the vessel, and Calkins had no relationship with the boat predicated upon any reasonable attributes associated with ownership. Id., at 1295.
In the present case, Winterville undertook many of the responsibilities of ownership while managing the M/V ANNE HOLLY. It operated under a written management agreement that was orally extended each year. It was completely responsible for hiring and managing the crew, paid all crew wages and benefits, provided all supplies for the vessel and crew, and maintained and repaired the vessel as need arose during a trip. Even during drydock, its employees assisted in making significant repairs to the vessel. It maintained regular daily contact with the vessel during a trip, and Winterville's president (James Nowell) was the contact person for any navigational issues that might arise. Although Winterville had no control as to where the M/V ANNE HOLY operated or what barges it would take on any particular trip, it had control over the M/V ANNE HOLLY's daily operation. The preponderance of the evidence at trial showed that at the time of the accident, *1101 Winterville's role under the contract "partakes of the nature of both charterer and owner pro hac vice ... (and) either status justifies its petition for limitation." Petition of the United States, 259 F.2d. at 610. Furthermore, as the employer of the personnel whose alleged negligence is asserted as the cause of the allision with the Eads Bridge, such negligence may constitute unseaworthiness, and liability ascribed to Winterville. Since the prime purpose of the Limitation Act has been to promote the employment of vessels in commerce and the encouragement of persons engaged in the business of navigation, Winterville "should be afforded the same kind of protection against the possibility of the crushing loss which might arise as is given said owner." Petition of United States, 259 F.2d at 611.
Having said this, the question arises as to what amount Winterville should provide in its limitation fund. Winterville has submitted a bond in the amount of $20,500.00 as its "interest" in the M/V ANNE HOLLY. President Casino contends that if this Court should determine that Winterville is entitled to invoke the protection of the Limitation Act, then its "interest" should be the value of the M/V ANNE HOLLY which has been determined to be $2.2 million.[29]
Upon reflection and review of งง 183 and 186, the Court agrees with those courts that have held that if a party seeks protection of the Limitation Act as a charterer or owner pro hac vice, then such party should be held as financially liable as the owner of the boat. "... it would seem to be only common sense that if a charterer wishes to be treated as an owner pro hac vice in order to limit his liability, he must stand in the shoes of the owner in respect of the amount of value surrendered. The owner's right to limit carries with it a reciprocal obligation, and so, to the same extent, should that of the charterer." Petition of McAllister Bros., 96 F.Supp. 575, 577 (E.D.N.Y.1951); see also, Avera v. Florida Towing Corp., 322 F.2d 155, 166 n. 10 (5th Cir.1963)(finding that the value to be surrendered or bonded by a bareboat charterer is the same as that exacted of an owner and quoting Petition of McAllister Bros., supra.). If Winterville wants the protection of the Limitation Act as a owner pro hac vice, then it should be treated as such, including surrender of the same amount of value as did American Milling; i.e. $2.2. million.
Even though American Milling and Winterville have been found to be the owner and owner pro hac vice of the M/V ANNE HOLLY and therefore entitled to invoke the Limitation Act, they are entitled to limit their liability only if the fault of Capt. Johnson which caused or contributed to the allision with the Eads Bridge was committed without their privity or knowledge. American Milling and Winterville contend that Capt. Johnson's negligent steerage of the M/V ANNE HOLLY was navigational error made by an otherwise competent pilot, and therefore, does not affect their entitlement to limit their liability. President Casino argues that it wasn't "navigational error" but the total *1102 incompetence of Capt. Johnson which caused the allision, and that American Milling and Winterville had privity and knowledge of his incompetence due to their failure to have written policies and procedures in place regarding the employment of crews, the training and supervision of crews, and marine operations.
As stated earlier, the determination whether a shipowner may limit liability involves a two-step analysis: 1) a determination of what acts of negligence or unseaworthiness caused the casualty; and 2) whether the shipowner had knowledge or privity of these acts. In re Cleveland Tankers, 67 F.3d 1200, 1203 (6th Cir.1995); American River Transp. v. Paragon Marine Services, at 1063. If the shipowner is a corporation, "knowledge is judged by what the corporation's managing agents knew or should have known with respect to the conditions or actions likely to cause the loss." Complaint of Hellenic, Inc., 252 F.3d 391, 394 (5th Cir.2001) quoting Brunet v. United Gas Pipeline, 15 F.3d 500, 504 (5th Cir.1994); see also, In the Matter of the Libel and Petition of Kristie Leigh Enterprises, 72 F.3d 479, 481 (5th Cir. 1996); In the matter of Adventure Bound Sports, 837 F.Supp. 1244, 1254-55 (S.D.Ga. 1993); B.F.T. Two Corp., at 874.
"Privity or knowledge" generally refers to the managing agent's personal participation in, or actual knowledge of, the specific acts of negligence or conditions of unseaworthiness which caused, or contributed to, the casualty. American River Transportation v. Paragon Marine Services, at 1063; see also, Complaint of Hellenic, Inc., at 394-396. "[i]t has been said that `privity' means some fault or neglect in which the owner personally participates, and `knowledge' means personal cognizance or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss or condition likely to cause or contribute to loss, unless proper means are adopted to prevent it." Illinois Constructors Corp. v. Logan Transportation, at 880 (citations omitted). However, "the limited liability doctrine is also sensitive to the scope of an owner's control over his agents." Complaint of Hellenic, Inc., at 396. Thus, under ordinary circumstances, wherein the owner is so far removed from the vessel that he cannot reasonably exert control over the captain or pilot's conduct, the captain/pilot's navigational errors at sea are generally not within the "privity or knowledge" of the owner. Id., at 396; Matter of Mac Towing, Inc., 670 F.2d 543, 548 (5th Cir. 1982); American Commercial Lines v. U.S., 590 F.Supp. at 824. If, however, the "navigational error, can be attributed to incompetence on the part of the crew, and such incompetence was within the shipowner's reasonable providence to discover, then limitation should be denied. Key factors which may contribute to a crew's incompetence, and be within the privity and knowledge of the shipowner and supervisory personnel, is the failure to implement proper procedures in hiring crews, the absence of any meaningful training, or the absence of the implementation of proper procedures for the safe navigation of the vessel." See, Hercules Carriers, at 1573-77; American River Transportation Co. v. Paragon Marine, at 1064; Complaint of Warrior & Gulf Navigation Co., 1997 A.M.C. 1432 (S.D.Ala.1996); Illinois Const. Corp., at 886-87; In the Matter of The Company of Magnolia Marine Transp. Co., 1987 A.M.C. 1167 (D.Kan. 1986).
The Court has already found that American Milling and Winterville had provided a seaworthy vessel and competent crew, so the issue becomes whether Capt. Johnson's act(s) of negligence were the result of such incompetency as to be within the privity and knowledge of American Milling and Winterville. President Casino contends *1103 that it was because of American Mining and Winterville's lack of "proper" hiring procedures, failure to provide proper training and supervision, and failure to properly supervise marine operations.
Before a shipowner can be found to have privity or knowledge of a crew member, sufficient evidence must exist showing that the shipowner was negligent in hiring or training the crew. The Court finds that the preponderance of evidence at trial showed that Capt. Johnson and his crew were clearly competent to man the M/V ANNE HOLLY and navigate her northbound through the St. Louis Harbor on the evening of April 4,1998.
American Milling was reasonably prudent in hiring Winterville to employ the crew aboard the M/V ANNE HOLLY. David Jump, American Milling's president, testified that he and Gary Ralston[30] contacted several marine enterprises, including East Side, who had used Winterville's crewing services and all spoke favorably of Winterville. Jump testified that he had several meetings with James Nowell, Winterville's president, concerning American Milling's crewing needs and Winterville's ability to provide for same, prior to entering into a contractual relationship with Winterville.
Nowell testified extensively as to its hiring practices, especially with regard to Capt. Johnson. Winterville required its pilots to have a minimum of ten (10) years experience to be considered for employment. All prospective crew members were subject to a background check. Capt. Johnson first submitted a written application for employment in 1987. President Casino's Exhibit C-3. This application was submitted although Nowell had personally known Capt. Johnson since the 1970s when Capt. Johnson had worked for Ramsey Transportation. Nowell was well aware of Capt. Johnson's experience piloting riverboats on the UMR. In fact, written on Capt. Johnson's application is the notation "good man, can handle 15 UMR". Gerald Tinkey, President Casino's marine operations expert, concurred with Nowell's testimony that this notation indicated that Capt. Johnson could handle a 15 barge tow on the Upper Mississippi River. Despite his personal relationship with Capt. Johnson, Nowell testified that he still had instructed his personnel staff contact former employers, as he does for all applicants. Former employers were contacted and Capt. Johnson had a favorable response from all who were contacted.
Nowell conceded that when Capt. Johnson returned to Winterville in 1993, he did not have Capt. Johnson submit another application for employment. However, he personally talked with Capt. Johnson about what he had been doing between the years 1989 and 1993 and was satisfied with Capt. Johnson's intervening work experience.
At the time of the allision with the Eads Bridge, Capt. Johnson had over thirty (30) years experience piloting the UMR; numerous trips southbound and northbound through the St. Louis Harbor. He was experienced in pushing large tows, including tows of 15 barges. He was experienced in piloting towboats, with a variety of barge configurations, in high water and flood water. He had been the captain aboard the M/V ANNE HOLLY since 1995. In all his many years piloting the Mississippi River, he had only one (1) other allision, and that allision had been at least ten (10) years earlier. As of April 4, 1998, Capt. Johnson was a licensed riverboat pilot, had an exemplary safety record, and was familiar with the M/V ANNE HOLLY, its tow, and the navigational conditions of the Upper Mississippi River, in *1104 the St. Louis Harbor. The Court finds that Capt. Johnson, at the time of the subject allision, was a competent master of the M/V ANNE HOLLY. No evidence suggested that American Milling and/or Winterville knew or should have known that Capt. Johnson was incompetent to master the M/V ANNE HOLLY (on April 4, 1998) due to inexperience or a history of navigational errors.
Furthermore, given Capt. Johnson's many years of experience on the UMR and his clean safety record, no evidence was adduced that would suggest that he was in need of further training or supervision. All the marine experts, even Capt. Schropp, testified as to Capt. Johnson' competency to master the M/V ANNE HOLLY. No one testified that he was in need of additional training or instruction in performing his duties as captain of the M/V ANNE HOLLY.[31] The Court finds that there was no showing that inadequate training directly contributed to the navigational errors) committed by Capt. Johnson as he proceeded through the Eads Bridge. See, Complaint of Hercules Carriers, 768 F.2d 1558, 1576 (11th Cir.1985)(crew's negligent acts directly attributed to lack of training program; thus, shipowner liable for failing to exercise due diligence in selecting, training, and maintaining a competent crew).
Next, claimants assert that American Milling failed to have policies regarding "marine operations". Nowell and Lamb testified at length as to American Milling's marine operations, and their working relationship. The preponderance of the evidence showed American Milling to have in place significant marine operation policies and procedures. Experienced pilots and captains were employed aboard American Milling vessels. Prior to the start of the towing season, management of both companies met with crew members to discuss the upcoming season, needs of the crew, and pertinent information regarding the boats themselves (off-season repairs, maintenance, replacement parts, etc.). Lamb boarded his boats several times throughout the towing season to meet and confer with the crew (including the M/V ANNE HOLLY). Each boat during the towing season was required to keep daily pilothouse and engine room logs which were faxed daily to American Milling, Winterville, and East Side. American Milling and Winterville reviewed these logs to monitor the performance of the crews and vessel.
Although Lamb and Nowell were available to any crewmember 24/7, by cell phone, to discuss any problems that might have arisen, the daily operation of the vessel was left to the captain's discretion. Winterville did not keep a "port captain" on shore to manage the vessels during towing season. All of the experienced riverboat captains who testified at trial agreed that the navigation of the vessels was generally left to the captains' discretion. All decisions regarding tow size, tow makeup, use of assist boats, when to proceed or not proceed with a tow due to river conditions were navigation decisions committed to the captains' discretion. Neither American Milling nor Winterville had a *1105 duty to employ a "port captain" in order to navigate the M/V ANNE HOLLY from their corporate offices. Delegating navigational decisions to the pilothouse personnel, instead of attempting to run a riverboat from the office, conforms with the general practice in the towboat industry. Illinois Constructors Corp. v. Logan Transportation, at 875. The tow had been entrusted to a competent captain and capable crew; thus, it was not negligent for American Milling or Winterville to fail to have a "port captain" making navigational decisions for the M/V ANNE HOLLY on the evening of April 4, 1998. American Milling and Winterville's policy to leave navigational decisions to competent captains of its vessels who possess first-hand knowledge of "on-the-scene" river conditions is a reasonable and acceptable maritime policy.
Although not pursued adamantly at trial, President Casino contends that Capt. Johnson's incompetence included a violation of Rule 5 by failing to post a proper lookout, and that such incompetence was within the privity and knowledge of American Milling and Winterville due to a lack of crew training and oversight. Capt. Johnson testified that he pulled his deckmates off the barges when going through the bridges for safety reasons. Especially at flood water stage, the limited clearance of the channel span of the Eads Bridge, is further reduced. The Court has already found that all navigational lights, including the peep light, were operational on the evening of April 4, 1998. There was no testimony at trial that Capt. Johnson's view of the Eads Bridge was at any time obstructed. Except for the fact that the M/V ANNE HOLLY was navigating in flood water, there was no indication of any problems along the river in the St. Louis Harbor, and the M/V ANNE HOLLY had not experienced any difficulties navigating the harbor earlier in the day. There was no apparent reason for Capt. Johnson to post a look out while navigating the Eads Bridge. Claimants have not established by a preponderance of the evidence that the failure to post a lookout was negligent. Furthermore, even if this Court were to find such a failure to be a negligent act by Capt. Johnson, such a decision was a navigational decision best left to Capt. Johnson to make and not within the privity or knowledge of American Milling or Winterville. "So long as an owner entrusts this decision to a competent crew, the determination whether to post a lookout is best left to the sound discretion of the pilot, who is aware of the on-the-scene conditions. If the decision not to post an additional lookout is negligent, it is a navigational error generally not within the privity or knowledge of the owner." Illinois Constructors Corp. v. Logan Transportation, at 884 (citations omitted); see also, Turecamo Maritime, at 1232.
After reviewing all the admissible evidence and the parties' arguments, the Court finds that the preponderance of the evidence establishes that although Capt. Johnson was negligent in navigating the Eads Bridge, he was not incompetent to master the M/V ANNE HOLLY at the time of the allision. He was a qualified pilot with extensive experience in piloting similar tugs under similar conditions in the St. Louis Harbor. Capt. Johnson was properly licensed, adequately trained, familiar with the navigable conditions of the St. Louis Harbor, and had an excellent safety record. The crew of the M/V ANNE HOLLY was qualified and competent. American Milling and Winterville were entitled to rely on the skill and experience of the M/V ANNE HOLLY crew to safely navigate the vessel through the Eads Bridge. The sole proximate cause of the allision with the Eads Bridge was Capt. Johnson's spontaneous negligent navigational error in misjudging the magnitude *1106 of the right hand set at the Eads Bridge.
The Court's conclusion is that there was no privity or knowledge on the part of American Milling and Winterville regarding the negligence committed by Capt. Johnson while navigating the M/V ANNE HOLLY northbound through the Eads Bridge on the evening of April 4,1998. As a result, American Milling and Winterville are entitled to limit their liability.

Allision with The ADMIRAL
This case is not the usual maritime collision case because it involves more than one allision affecting the interests of several parties. After the M/V ANNE HOLLY hit the Eads Bridge, eight of the barges in tow broke loose, and the credible evidence showed that two (2) of these barges allided with the ADMIRAL. At the time of this second allision, the ADMRAL was a gaming vessel permanently moored in a navigable channel of the UMR, downstream from the Eads Bridge. American Milling and Winterville contend that President Casino should share in the fault and resulting damages because President Casino failed to take reasonable steps to protect the ADMIRAL from allision(s) from breakaway tows; and furthermore, because President Casino failed to erect a protective cell as required by its mooring permit issued by the Army Corps of Engineers. President Casino contends that it should not be held liable for any of the damages due to the allisions since the lack of a protective cell (or any other protective measure) did not cause the M/V ANNE HOLLY to allide with the Eads Bridge which resulted in the barges breaking loose from the tow; and furthermore, the ADMIRAL was properly moored in the St. Louis Harbor without a protective cell since the Coast Guard had not required President Casino to provide one for the ADMIRAL.
Liability for allisions is generally predicated upon a finding of fault that caused or contributed to the damage that occurred. As stated previously, with respect to the element of fault, the standard of care against which fault is determined is derived from general concepts of prudent seamanship and reasonable care, statutory and regulatory rules governing the movement and management of vessels and other maritime structures, and recognized maritime customs and usages. Folkstone Maritime, at 1046. Thus, liability for an allision can be based upon a finding of negligence. "The test and standard for a finding of negligence is reasonable care under the circumstances, or whether, judged against the standard of good and prudent seamanship, the allision could have been prevented by the exercise of due care. Each case must be reviewed by considering the specific factual circumstances under which the accident took place." Folkstone Maritime, at 1046 (citations omitted). Such a review does not require that "an extreme degree of caution or other exacting standard of care be used", only that any errors of judgement be within the ordinary care standard; otherwise, fault will be imputed to the negligent party. Folkstone Maritime, at 1046 (citations omitted). In order for liability to be imposed in a maritime allision case, the fault must be a proximate cause of the injury; i.e. the fault committed by the operator of the instrumentality (in the instant case, the ADMIRAL) must be a contributory cause of the collision. Folkstone Maritime, at 1046 (citations omitted).
The preponderance of the credible evidence at trial showed that the risk of an allision between the ADMIRAL and a drifting barge, especially in high or flood water, was significant. From 1985-1998, the ADMIRAL had been hit (in the same general area of the vessel), in high water, four (4) times. Given the revenue generated *1107 by the ADMIRAL's gambling business, the cost of a protective cell, as one suggested means of protection, was relatively low at $150,000.00 per cell. Christopher Groves, a maritime engineering expert with substantial experience on Corps of Engineers projects and in designing protective structures, testified at length that at least one (1) protective cell would have accorded the ADMIRAL with protection from a drifting barge in high water[32] and that in his opinion the failure of the President Casino to move the ADMIRAL to a less risky location for allisions with drifting barges, or to erect a protective cell, was unreasonable. Testimony of Christopher Groves, Tr.9/25/00, pgs. 83-84; 139; 165; deposition of C. Groves, pgs. 96-98. When President Casino sought to moor the AMIRAL below the Eads Bridge as a gambling enterprise in 1984, Col. Suermann approved the permit modification, but in doing so, recognized the high risk of allisions with breakaway tows by stating that "I have deemed it necessary that the S.S. ADMIRAL must emplace a protection cell to provide protection from the ice flow, debris and breakaway tows." The Court finds that this was not a "suggestion" by Col. Suermann (as argued by President Casino), but rather a requirement for approval of the permit modification.[33]
William Ashton and Gary Frommelt testified, on behalf of President Casino, that a protective cell was not necessary and that a cell would not have accorded the ADMRAL any protection from the breakaway barges. While it is true that a single cell probably would have proven useless against an allision with a loaded 15 barge tow traveling downriver in high water, the risk of allision was not from 15 barges, but rather from one or two drifting barges. The ADMIRAL's own allision history proves the reality of such a risk. President Casino offered little credible evidence to show that a protective cell would not have prevented or minimized the impact of the allision with one or two drifting barges as occurred on the evening of April 4, 1998.
Ashton testified that he believed that Col. Suermann's letter allowing the permit modification upon the erection of a protective cell was merely a "suggestion" and not a requirement begs the question as to negligence. Even if the Court were to view Col. Suermann's letter as merely suggesting the erection of a protective cell (which the Court does not), President Casino was still obligated to assess the risk of allision with one or two drifting barges in high water and give meaningful consideration to the Army Corps of Engineers concerns. There is no credible evidence before this Court that demonstrates that such a prudent review was ever undertaken. Even though Frommelt was advised by other maritime personnel that a protective cell should have been built to protect the ADMIRAL and passed this advice on to senior President Casino personnel, the cell was never built. Tr. 7/7/00, pg. 100; Frommelt Deposition, pgs. 53, 92; Compton Deposition, pgs. 9-17. Ordinary standard of care dictates that the Army Corps of Engineers' "suggestion" of a protective cell should have been taken.
President Casino further argues that even if it had wanted to build one or two protective cells it could not have because the City of St. Louis would not have permitted cells to be built on the riverfront *1108 between the Poplar Street Bridge and the Eads Bridge. This argument is meritless for the simple fact that no evidence was presented by the President Casino that it ever sought permission from the City to build one or two protective cells for the ADMIRAL.[34]
Messrs. Ashton and Frommelt are employees and/or shareholders of President Casino. Although competent to render an opinion regarding the necessity of one or more protective cells, their financial interest in President Casino renders their opinions less credible than those of Mr. Groves and Col. Suermann. The Court finds that despite the likelihood and severity of a barge allision, and with the knowledge of a known probable risk of injury to the vessel and persons aboard it, the President Casino failed to take any action, whether it be to erect protective cell(s) or move the AMIRAL, to protect the vessel from such allisions. The Court finds that the President Casino failed to take reasonable care under the circumstances to protect the ADMIRAL from an allision with one or more runaway barges on the night of April 4, 1998, and that such negligence was a contributory cause of the subject allision.
The Court further finds that President Casino's failure to construct one or more protective cells was in violation of its Army Corps of Engineers permit, and such violation contributed to the allision with the ADMIRAL.
When a ship at the time of the allision with a stationary object is in violation of a statutory or regulatory rule intended to prevent such allisions, a rebuttable presumption arises that the violation was at least a contributing cause of the allision. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148 (1873); see also, Complaint of Wasson, 495 F.2d 571, 580 (7th Cir.1974); Ingram Barge Co. v. The Valley Line, 470 F.Supp. 140, 147 (E.D.Mo.1979); Three Rivers Rock Co. v. The M/V Martin, at 18. Under the Pennsylvania rule, if a vessel[35] involved in a collision was violating a statutory or regulatory rule intended to prevent collisions, then such vessel has the burden of proving not only that the fault probably was not one of the contributing cause of the accident, but also that it could not have been a contributory cause. Folkstone Maritime, at 1047 citing The Pennsylvania, supra. As stated previously, the three (3) required elements for application of the Pennsylvania rule is 1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; 2) the statute or maritime regulation must involve marine safety or navigation; and 3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. Folkstone Maritime, at 1047. Since it is a rebuttable presumption of fault, the alleged violator can overcome the burden of proof imposed by the rule by showing that the accident would have occurred despite the statutory or regulatory violation. Folkstone Maritime, at 1047 citing Consolidated *1109 Grain & Barge Co. v. Wisconsin Barge Line, 522 F.Supp. 842, 847-48 (E.D.Mo.1981). President Casino contends that even if the requirement for a protective cell had existed, it was rescinded by the Coast Guard. It further contends that the lack of a protective cell was not a contributory cause of the allision(s). Thus, President Casino argues the Pennsylvania rule does not apply. After careful consideration of the credible evidence before the Court, the Court finds that the rule does apply, and that the President Casino failed to overcome the presumption of fault attributing the failure of it to erect one or more protective cells to be a contributory cause of the allision(s).
The Rivers and Harbors Act of 1899 prohibits obstructions in navigable waterways unless permitted by the Secretary of the Army and the Chief of Engineers (hereinafter referred collectively as the Army Corps of Engineers). 33 U.S.C. ง 401 et. seq. On November 23, 1994 Col. Suermann of the Army Corps of Engineers conditioned the approval of a permit modification for the President Casino to moor the ADMIRAL below the Eads Bridge upon the construction of one or more protective cells for the express purpose of protecting it and the persons aboard from collision with runaway barges. Modifications of permits issued by the Army Corps of Engineers must be in writing. 33 C.F.R. ง 325.7(b). There is no written document evidencing a rescission of the protective cell requirement of modified Permit No. P-1550. Although Capt. Scott Cooper of the United States Coast Guard offered his opinion to the Army Corps of Engineers that a protective cell was unnecessary to protect the ADMIRAL for allisions with runaway barges, his opinion is not binding and does not carry the weight of a statutory or regulatory mandate. Only the Army Corps of Engineers can modify, in writing, a Corps permit. Furthermore, the second modified Corps permit relating to the ADMIRAL fails to revoke the protective cell requirement. Permit No.P-2027 authorizing the President Casino to moor an additional support barge and a casino riverboat, stated specifically:
"All general and special conditions pertinent to previous Department of Army permits the permittee possesses still Apply and are hereby incorporated by reference into Permit P-2027."
While it is true that the Corps apparently never took any affirmative action with regard to President Casino's failure to construct a protective cell, this inaction cannot be construed by the Court as a clearly expressed waiver of the protective cell requirement. As of April 4, 1998 the requirement of a protective cell, as proscribed in modified Permit No. P-1550, remained intact having not been rescinded or waived by the Army Corps of Engineers.
While the mere presence of an object in a navigable river does not necessarily require a finding that the object is in violation of the Rivers and Harbors Act, nor demands a finding of negligence on the part of the object's owner when the object is struck by a ship, see, Dow Chemical Co. v. Dixie Carriers, Inc., 463 F.2d 120, 122 (5th Cir.1972); Pillsbury Co. v. Midland Enterprises, 715 F.Supp. 738, 761 (E.D.La. 1989), if such an object is anchored in an "unlawful" manner or location, then the owner is subject to liability. When a vessel is moored in a "dangerous" position in a channel, its master is bound to exercise reasonable care and skill, including abiding by all applicable statutory and regulatory rules, in occupying such position.
"Where a vessel is at anchor in a proper place, and is observant of the precaution required by law, it is not liable for damages sustained by a vessel in motion colliding with it, but where it anchors in an unlawful position, or fails to observe *1110 the statutory requirements and such other precautions as good seamanship would suggest, it must suffer the consequences attending a violation of the law."
United States v. St. Louis & Mississippi Valley Transportation Co., 184 U.S. 247, 255, 22 S.Ct. 350, 46 L.Ed. 520 (1902) quoting Spencer on Marine Collisions, งง 99, 106; see also, The Amiral Cecille, 134 F. 673, 677 (D.Wash.1905) citing United States v. St. Louis & Mississippi Valley Transportation, supra.
President Casino's failure to comply with modified Permit No.P-1550 triggers the application of the Pennsylvania rule. See, Orange Beach Water, Sewer and Fire Protection Authority v. M/V ALVA 680 F.2d 1374, 1383 (11th Cir.1982); Complaint of Wasson dba M/V DEL RIO, 495 F.2d 571, 579 (7th Cir.1974); United States v. Norfolk-Berkley Bridge Corp., 29 F.2d 115 (E.D.Va.1928). President Casino failed to show, by a preponderance of the evidence, that its violation of modified Permit No.P-1550 did not causally contribute to the casualty. It is this Court's considered opinion that American Milling and Winterville (as custodians of the unmanned runaway barges) and President Casino's actions all contributed to cause the allision(s) with the ADMIRAL on the evening of April 4,1998.[36]

Allocation of Liability
Since more than one party contributed to the damages sustained in this maritime accident, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); see also, Arkansas State Highway Commission v. Arkansas River Co., 271 F.3d 753, 759 (8th Cir.2001); Complaint of Valley Towing Service as owner of the M/V CITY OF GREEVILLE, 629 F.Supp. 139, 147 (E.D.Mo. 1985); Claim of Gypsum Carrier, at 1061.[37]
*1111 After careful consideration of the testimony and evidence presented, the credibility of the witnesses and the weight given to their testimony, the exhibits received into evidence and the applicable law, and based upon this Court's findings of fact and conclusions of law, the Court concludes that Captain John 0. Johnson was negligent in his navigation of the M/V ANNE HOLLY and her tow as he proceeded northbound through the St. Louis Harbor, specifically the Eads Bridge, on the evening of April 4, 1998. His negligence caused the allision of his tow with the Missouri bridge pier of the center span of the Eads Bridge, resulting in the breakaway of one or more barges from the tow. However, Capt. Johnson's negligence was not the sole proximate cause of the subsequent allision of the runaway barges with the ADMIRAL. A contributing cause of the damages sustained in connection with the second allision was President Casino's negligence in failing to take reasonable steps, including but not limited to the construction of one or more protective cells, to protect the ADMIRAL from such allision(s). Furthermore, President Casino failed to comply with the Army Corps of Engineers requirement for such protective cells when it issued modified Permit No.1550. In light of these findings, the Court rules that liability as to the claims of President Casino and any of the persons who claim to have been injured or damaged as a result of the allision between the runaway barges and the ADMIRAL shall be apportioned as follows: President Casino is deemed to be twenty percent (20%) liable; and American Milling, Winterville, and Captain John O. Johnson are deemed to be eighty percent (80%) liable, jointly and severally.
Furthermore, the Court holds that American Milling and Winterville, as owners and/or owners pro hac vice of the M/V ANNE HOLLY, are entitled to limit their respective liability to their interest in the M/V ANNE HOLLY and its pending freight as determined previously by this Court to be $2.2 million.[38] American Milling and Winterville are entitled to limit their liability because they lacked the requisite "privity and knowledge" of Capt. Johnson's negligent navigational acts which caused or contributed to the allision with the Eads Bridge, the tow break-up, and the subsequent allision between one or more breakaway barges from the M/V ANNE HOLLY's tow with the ADMRAL. For the reasons stated in this opinion, and in the Court's earlier ruling, American Milling and Winterville are each-entitled to limit their respective liability to the value of their interests in the M/V ANNE HOLLY, which the Court has determined to be $2.2 million.[39]
Finally, the Court finds that the Barge Claimants are entitled to recover on their claims against American Milling, Winterville, and Capt. John O. Johnson without regard to any apportionment of fault. However, as to American Muling and Winterville, the Barge Claimants are only entitled to judgment in a sum that represents the ratio that each claimant's barge damage claim relates to the total sum of all the claims against the limitation fund. The Barge Claimants are entitled to a judgment for each claimant's provable damages against Capt. John O. Johnson, together with their costs.
NOTES
[1] The lead case is 4:98CV575SNLโfiled by American Milling; and the second limitation of liability case is 4:98CV1630SNLโfiled by Winterville.
[2] The negligence case against Capt. Johnson is 4:00CV59ERW and was consolidated with the limitation of liability cases on May 4, 2000.
[3] Although fourteen (14) barges were in the tow on April 4, 1998, the above-identified barges are the ones that have filed claims in this case.
[4] For reasons of judicial efficiency, the City of St. Louis' claims for economic damages in connection with the subject marine accident will be addressed in a separate opinion.
[5] The trial dates were as follows: June 13-30, 2000; July 5-7, 2000; and September 25-28, 2000.
[6] Recently, President Casino filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division. On August 21, 2002, U.S. Bankruptcy Judge Edward R. Gaines modified the automatic stay to allow this litigation to proceed. See, Court Order # 1526.
[7] The Court is aware of decisions admitting Coast Guard investigatory reports as a public records exception to the hearsay rule; however, the majority of these decisions were prior to the 1996 enactment of 46 U.S.C. ง 6308. Since the enactment of this statute, the majority of courts addressing the admissibility of Coast Guard reports have held them (or any part thereof) inadmissible. See, In re Proescher, 1999 A.M.C. 1612 (N.D.Cal.1999); In re Crounse Corp., 956 F.Supp. 1384 (W.D.Tenn. 1997); Conagra, Inc. v. Weber Marine, 1999 WL 705546 (E.D.La.1999). Recently, the Eighth Circuit Court of Appeals ruled a Coast Guard report admissible under Rule 803(8)(C); however, the subject report was not generated under 46 U.S.C. ง 6301, therefore, not subject to the restriction of ง 6308. See, Union Pacific Railroad Company v. Kirby Inland Marine, Inc. of Mississippi, 296 F.3d 671 (8th Cir.2002).
[8] At trial, evidence was adduced that a fourth allision similar to the one involving the M/V WENDY ANN had occurred sometime after 1988 but details were not forthcoming. See, American Milling Exhibit 7.
[9] On April 4, 1998 the UMR at the St. Louis Harbor was at 31.7 ft on the St. Louis gauge.
[10] This diagram of the M/V ANNE HOLLY's tow configuration on April 4, 1998 is taken from President Casino's Exhibits H-1 and 2.
[11] M/V ANNE HOLLY would have to have a minimum of 2750 hp. for its tow of twelve (12) loaded barges.
[12] In admiralty terminology, an "allision" occurs when a moving object (such as a boat) hits a stationary object (such as a bridge). A "collision" occurs when two or more moving objects hit each other.
[13] Several days after the accident, on April 9, 1998, Capt. Simmons gave a hand-written account of the April 4, 1998 incident to the Coast Guard in which he noted the time as 7:45 p.m. However, he gave this statement without benefit of his logs. The Court finds the contemporaneous logging of the time in his vessel and pilothouse logs to be more credible that the time recollected several days later.
[14] This videotape, which was viewed by the Court and counsel many times during trial, was created under the supervision of the NTSB.
[15] There appears to be some confusion in the parties' pleadings as to Capt. Johnson's status with regard to Winterville's sought-after protection under the Limitation of Liability Act. There is nothing before this Court to indicate the Capt. Johnson is seeking protection under the Act. At trial it was clear to this Court that Capt. Johnson was simply seeking to defend himself against the claim of negligence brought by President Casino and the Barge Claimants. However, as will be further developed in this opinion, his actions on the evening of April 4, 1998 certainly have a significant bearing on the Court's ultimate determination as to whether American Milling and/or Winterville are entitled to exoneration or limitation of liability under the Act.
[16] For an excellent overview of the myriad of maritime legal presumptions and their everchanging application in maritime cases, see 9 U.S.F. Mar.L.J. 225 (Fall 1996)(Skimming the Surface: A Primer on the Law of Collision, Nikas, Richard J.)
[17] This presumption is commonly referred to as the "Oregon rule".
[18] The United States has adopted a set of navigational rules known as the Inland Navigational Rules (INR). These rules encompass long-established steering and sailing rules and regulations governing navigation on this country's inland waters (such as the Mississippi River). Inland River Towing v. American Commercial Barge Line Co., 143 F.Supp.2d. 646, 649 (N.D.Miss.2000). The latest unification of these rules and related regulations were codified by the Inland Navigational Rules Act of 1980, 33 U.S.C. งง 2001-2038. Any person who undertakes the navigation of inland waters is charged with knowledge of the INR and a mandatory duty to abide by them. Turecamo Maritime, at 1228.
[19] The Court's reference to a "vessel owner" is not meant to exclude any other category of persons or entities that may by entitled to the protection of the Limitation of Liability Act; such an issue will be addressed later in this opinion. For the moment, the Court simply uses the term "vessel owner" to represent all those who may be entitled to the protection of the Limitation of Liability Act.
[20] Winterville and Capt. Johnson are pursuing their defense in tandem; i.e. Winterville's arguments are applicable to Capt. Johnson in so far as the issue of his negligence. However, the Court notes that Capt. Johnson would prefer to be completely exonerated from any liability for the allision with the Eads Bridge; whereas, although Winterville prefers exoneration, it does provide an alternative argument regarding lack of privity and knowledge regarding any alleged negligence on the part of Capt. Johnson.
[21] For the most part, the arguments proffered by President Casino have been adopted by the barge claimants. Also, it should be noted that those individual claimants who elected to file post-hearing briefs or memorandums have also adopted the arguments proffered by President Casino in so far as the rejection of limitation of liability for American Milling and Winterville. They do not necessarily concur with the President Casino's position regarding its own liability for the allision of the barges with the ADMIRAL.
[22] President Casino offers a myriad of "negligent" acts or conditions of unseaworthiness; however, the ones referenced above were the subject of most of the evidence presented and argued at great length in post-hearing briefs. The Court finds that any other charges of negligence or unseaworthiness were simply cumulative and deems them meritless.
[23] The bulk of Capt. Johnson's testimony regarding his navigation of the St. Louis Harbor, especially his approach to the Eads Bridge, on the evening of April 4, 1998 can be found in the Trial Transcript for June 14-15, 2000. The navigation path taken by Capt. Johnson is depicted in American Milling Exhibit 184โPowerpoint Presentation by Capt. Rushing of the route taken by Capt. Johnson and adopted by Capt. Johnson as an accurate representation of his navigation route on April 4, 1998.
[24] The bulk of Capt. Rushing's testimony can be found in the Trial Transcript for June 26, 2000; Capt. Jamison's testimony crucial to his opinion regarding Capt. Johnson's approach to the Eads Bridge was via his deposition, pgs. 130-135. Capt. Schropp had also produced (President Casino Exhibit N-11) four printouts of his voyage aboard the M/V R. CLAYTON MCWHORTER on March 12, 2000 northbound through the St. Louis Harbor. Although this exhibit was admitted, the Court gives it little weight (different vessel, different river conditions almost two years later, different captain/pilot navigating) except for the fact that it closely mimics the route and approach taken by Capt. Johnson on April 4, 1998.
[25] See, President Casino Exhibit 80 (video of April 8, 1998 transit northbound through the St. Louis Harbor).
[26] A peep light is a navigational light placed at the front end of the tow and is used by pilots navigating at night to determine the swing of the tow. Alter Barge Line v. TPC Transportation Co., 801 F.2d 1026, 1028 (8th Cir.1986).
[27] In the instant case, there is no "pending freight" issue regarding limiting liability.
[28] In another case within this district, the court allowed the operator of a tug that had been involved in the alleged grounding of a barge to invoke the protection of the Limitation Act (as well as the owner of the tug). Unfortunately, the district court did not address any issues regarding the tug operator's entitlement to the protections of the Limitation Act. American Commercial Lines, Inc. v. U.S., 590 F.Supp. 816, 824-25 (E.D.Mo.1984), vacated in part and remanded on other gds, 781 F.2d 114 (8th Cir.1985).
[29] On January 9, 2001, after an extensive hearing on the matter, the Court determined that the fair market value of the M/V ANNE HOLLY following the allision with the Eads Bridge was $2.2 million for purposes of the limitation fund. See, In re American Milling, 125 F.Supp.2d. 981 (E.D.Mo.2001). This finding was limited to American Milling's purported interest. As regards Winterville's interest, currently pending before the Court is President Casino's Motion to Compel Winterville to Deposit Additional Security Funds Into Court (#871). This motion was held in abeyance until such time the Court addressed the issue subsequently raised as to Winterville's entitlement to invoke the protection of the Limitation Act.
[30] At the time of the trial, Mr. Ralston was decided.
[31] As for the rest of the crew, the Court finds Capt. Hoelscher and Chief Engineer Brown to be equally competent with regard to their duties aboard the M/V ANNE HOLLY. Both had many years aboard riverboats navigating the UMR. Both were very familiar with the navigational conditions of the St. Louis Harbor. Both had served upon the M/V ANNE HOLLY for several years prior to the allision. Furthermore, Chief Engineer Brown was not only familiar with the engines of the vessel, he had been repairing and maintaining them for almost six (6) years prior to the allision. The preponderance of the evidence showed these men to be qualified and capable of successfully navigating the M/V ANNE HOLLY on the evening of April 4, 1998.
[32] Groves also testified that more than one cell would be needed to protect the ADMIRAL from an allision with a drifting barge in low water; however, such a risk is small compared to the risk of allision in high water.
[33] The matter of the permit modification and the protective cell requirement will be addressed later in this opinion.
[34] Even if the City had rejected such a request, the issue of President Casino's negligence still exists. The primary contention at trial and in the briefs was the President Casino's failure to erect protective cell(s). However, the broader issue regards the President Casino's failure to take any reasonable steps to protect the ADMIRAL from an allision with one or two drifting barges, including moving the vessel to a different (and presumably, safer) location along the river.
[35] The rule has been extended beyond vessels to structures such as bridges, wharves, piers, and docks. This Court finds no legal basis not to extend it to a gambling vessel, stripped of all means of independent movement, permanently moored in a navigable channel of a major recreational and commercial waterway.
[36] This is not a case of "superceding" cause of damages so as to cut-off American Milling and Winterville's liability in connection with Capt. Johnson's negligence. President Casino's negligence was an independent, not superceding, cause of its damages. See, Exxon v. Sofec, 54 F.3d 570, 574 (9th Cir.1995), aff'd 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996)(negligence considered to be superceding cause of damages should be "extraordinary" negligence).
[37] For an interesting and compelling analysis of the comparative negligence-proximate cause application in a maritime collision/allision case, see City of Chicago v. M/V MOGAN, 248 F.Supp.2d. 759 (N.D.Ill.2003). The Illinois district court rejected the City's position that it could not have any contributory responsibility because its negligence (improper maintenance of timberwalers resulting in the severance of power cables when the M/V MORGAN struck the East 95th Street Bridge) was not a cause of the allision itself. The district court found that the City's negligence was a proximate cause of the damages from the allision; thus, the Reliable Transfer rule of apportioning liability was applicable. The City of Chicago v. M/V MORGAN case mirrors the words of the Eighth Circuit in Arkansas State Highway Commission, supra, when it considered the negligence of the tugboat captain and the negligence of the Army Corps of Engineers in a bridge allision. After determining that the district court could have found both these parties negligent, it stated: "Such findings would certainly be consistent with our view that both the Corps' conduct and Captain Foster's conduct proximately caused the bridge damage, and the parties' fault should have been apportioned. Following United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct 1708, 44 L.Ed.2d 251 (1975), the rule of comparative fault applies in a collision case where the concurrent negligence of two or more parties results in the damage that is the subject of the suit." Arkansas State Highway Commission, at 759 (emphasis added). Both courts apportion liability when a causal connection can be made, as regards two or more parties, between conduct and damages incurred.
[38] See, In the Matter of the Complaints of American Milling and Winterville Marine Services, et. al., 125 F.Supp.2d. 981 (E.D.Mo. 2001).
[39] Upon the filing of this opinion, the Court will grant President Casino's pending Motion to Compel Winterville to Deposit Additional Security Funds Into Court (# 871).